On Application for Reheating

STUART, Justice.
This Court’s opinion of April 24, 2009, is withdrawn, and the following is substituted therefor.
*1180 Yvonne Sumerlin petitioned this Court for a writ of mandamus directing the Jefferson Circuit Court to enter a summary judgment in her favor on the ground that she is entitled to State-agent immunity in a wrongful-death action pending against her and others. We grant the petition and issue the writ.

Facts

On Friday, September 6, 2002, the mother of Austin Taylor Terry[1] admitted 12-month-old Terry, who had bruises on both sides of his face, both ears, his neck, and his clavicle area, to the Children’s Hospital of Alabama. Wanda Hawkins, a medical social worker at Children’s Hospital, notified the Jefferson County Department of Human Resources (“DHR”) of Terry’s injuries and reported to the intake worker that Terry had suffered “suspicious non-accidental injuries”; as part of the initial-intake information, the intake worker designated the case as one requiring an “immediate” response. Hawkins also spoke with Sumerlin, a service supervisor at DHR. According to Hawkins, she told Sumerlin that Terry should not be allowed to go home with his mother until DHR could conduct an investigation because she suspected child abuse and neglect based on the nature of Terry’s injuries and his mother’s “flat affect,” i.e., her nonrespon-sive attitude.
Sumerlin did not have an investigator available on September 6, 2002, to immediately investigate the suspected abuse. Sumerlin, however, confirmed that Terry could remain at Children’s Hospital, a protective environment, until Monday, September 9, when the situation could be investigated. Sumerlin requested that the hospital contact DHR before discharging Terry.
That same day, Terry’s father learned of Terry’s hospitalization and contacted DHR. Because he telephoned the DHR office after office hours, his call was forwarded to an on-call DHR service worker, Tammie Godfrey. After speaking with Terry’s father, Godfrey went to Children’s Hospital. At the hospital, Godfrey met with Terry’s father and helped police officers take photographs of Terry. Godfrey also talked with Terry’s mother. Godfrey learned that Terry’s mother and Chris Wesson, her boyfriend, had been in the house with Terry on the day Terry was injured. According to Terry’s mother, Terry had fallen out of his crib. Godfrey concluded that Terry should not go home with his mother upon his discharge from Children’s Hospital, and she informed the police of her conclusion. She summarized her findings in a report and submitted it to an administrative assistant at DHR.
On Monday, September 9, 2002, Sumer-lin assigned the investigation of Terry’s suspected abuse to Joann Hood. During Sumerlin’s deposition, she was asked why she did not assign a caseworker to Terry’s case immediately on Friday, September 6. She responded:
“Because I had handled it over the phone that Friday. When I spoke with Ms. Hawkins she told me that — because it came in that Friday as an emergency, and I talked with her, she said the baby would be in the hospital and the baby would be there through Monday and [it] was not a life-threatening situation, I was told the baby was in a stable situation, if the baby could stay there because my emergency person for that day [Friday, September 6] was currently *1181 working an emergency. She agreed that the baby would stay there until my worker saw him on Monday.”
That same day, Monday, September 9, Cindy Deerman, a medical social worker at Children’s Hospital, telephoned DHR and spoke with Sumerlin to find out DHR’s plan for Terry. Sumerlin, who had not received Godfrey’s report, informed Deer-man that Terry could go home with his mother at discharge and that Hood would meet Terry and Terry’s mother at their house. The materials indicate that Terry was discharged from Children’s Hospital at 1:30 p.m. on Monday, September 9.
On September 10, 2002, at approximately 10:00 a.m., Hood visited Terry and his mother at their house. Wesson was in the house at the time of Hood’s visit. Hood interviewed Terry’s mother and Wesson. She also telephoned Martha Musso, Terry’s great-grandmother. During the visit, Wesson and Terry’s mother showed Hood Terry’s crib. Wesson and Terry’s mother explained that something was wrong with the rail on the crib because it would come off track and fall down. They stated that Terry had been injured when he fell out of the crib. Hood observed the bruise on the right side of Terry’s face and the blotches on his jaw area. She concluded that Terry’s injuries were consistent with his having fallen out of the crib. Hood told Terry’s mother to acquire another crib, and she had Terry’s mother and Wesson place the side of the crib with the broken rail against the wall to prevent future falls until they could acquire another crib. Hood determined, based on her initial investigation, that it was safe to leave Terry in his mother’s care.
On November 3, 2002, Terry died from brain injuries caused by punches to his head inflicted by Wesson. Wesson is currently serving a 20-year sentence for manslaughter as a result of Terry’s death.
The materials before us indicate that Sumerlin admitted that intake information relevant to Terry’s suspected abuse “fell through the cracks.” She stated that Hood reported her initial investigation findings to Sumerlin and that based on the information she had she agreed with Hood’s recommendation that Terry stay in the home with his mother.
Doris Williford, as personal representative of Terry’s estate, filed a wrongful-death action against Sumerlin, in her individual capacity, and others, including Susan Toole, the child-welfare administrator for DHR. In the complaint, Williford alleged that Sumerlin negligently and wantonly violated duties she owed Terry, who, as a victim of child abuse, was in need of the State’s protection. Specifically, Willi-ford alleged that Sumerlin negligently and/or wantonly violated applicable standards of care in child welfare:
“(a) by failing to comply with applicable rules, standards, regulations policies and/or procedures regarding the proper care, investigations and reporting of a suspected child abuse and/or neglect case in Jefferson County, Alabama;
“(b) by failing to ensure that [Hood] complied with mandatory rules and regulations pertaining to child abuse investigations;
“(c) by failing to timely and adequately gather and communicate to [Hood] all pertinent information regarding Austin Taylor Terry;
“(d) by failing to dispatch [Hood] or another child abuse and neglect investigator to Children’s Hospital within 12 hours after receipt of the report of alleged abuse to Austin Taylor Terry;
“(e) by failing to implement safety measures for the protection of Austin Taylor Terry prior to his release from Children’s Hospital;
*1182 “(f) by failing to implement a safety plan for the protection of Austin Taylor Terry;
“(g) by failing to comply with the requirements of the R.C. Consent Order[2] by assigning the Austin Taylor Terry investigation to a case worker, [Hood], whose case load exceeded the R.C. case load mandate; and,
“(h) by failing to require timely completion of the investigation and reporting of said investigation by [Hood].”
Sumerlin answered, denying the material allegations of the complaint and asserting the defense of State-agent immunity. After some discovery was conducted, Sum-erlin moved for a summary judgment, arguing that she was entitled to State-agent immunity because, she said, her duties were supervisory in nature and she had not acted beyond her authority by violating any DHR policies. She maintained that Williford could not provide any evidence indicating that Sumerlin had “failed to follow applicable law or departmental rules, practices, or procedures or that [she] acted outside her authority as an employee of [DHR].” Additionally, she asserted that Williford could not provide any evidence indicating that Sumerlin had “acted willfully, maliciously, fraudulently, in bad faith, beyond her authority, or under a mistaken interpretation of law.”
Williford responded, arguing that Sum-erlin was not entitled to State-agent immunity because, she said, Sumerlin had acted “beyond her authority” or “under a mistaken interpretation of the law” by failing to follow established policies in the Child Protective Services Policies and Procedures Manual (hereinafter “the DHR manual”) and to ensure that Hood followed those requirements. Specifically, she alleged that Sumerlin failed to follow the following two policies regarding intake and initial assessment in cases of suspected child abuse or neglect:
“CA/N [child abuse/neglect] Intake “IV. Analysis and Decision-Making
[[Image here]]
“D. DHR Response Times
“DHR’s response time is the time frame within which in-person initial contact shall be made with (1) the children who are allegedly at risk of serious harm and (2) all other children in the home.
“Designated response times are ‘immediate’ and ‘within five (5) calendar days.’ ‘Immediate’ is defined as ‘as soon as possible after a report is received, but no later than twelve (12) hours from receipt of the intake information.’
[[Image here]]
“CA/N [child abuse/neglect] Initial Assessment
“VI. Review, Approval, and Assignment for On-going Services
“1. Supervisory Review
“Supervisors shall review all initial assessments to determine that:
“ — child welfare staff have complied with the general requirements and information collection protocol;
“ — any deviations have received supervisory concurrence and been adequately documented;
*1183 “ — documented information is pertinent and sufficient to make the required initial assessment decisions.”
According to Williford, Sumerlin failed to ensure that an investigation of Terry’s suspected abuse was conducted “immediately” and that Hood had compiled her investigation information and documented her initial-assessment decision. Additionally, Williford maintained that Sumerlin deviated from DHR policy by failing to evaluate Hood’s assessment and failing to concur with Hood’s deviations from policy. Lastly, she argued that Sumerlin violated the R.C. consent decree by assigning the case to Hood, whose caseload was over the standard set in the R.C. consent decree.
After conducting a hearing, the trial court denied Sumerlin’s summary-judgment motion, stating:
“Generally, State agents are afforded immunity when the conduct made the basis of the claim is based upon the exercise of judgment in discharging governmental duties. Ex parte Cranman, 792 So.2d 392 (Ala.2000). But a State agent is not immune from civil liability in her personal capacity ‘when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.’ 792 So.2d at 405. ‘A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.’ Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003); Ex parte Butts, 775 So.2d 173, 178 (Ala.2000).
“After consideration of the briefs, evi-dentiary submissions and arguments of counsel, the Court concludes that the motion for summary judgment filed by ... Yvonne Sumerlin [is] due to be denied. [Williford] has submitted substantial evidence that ... Sumerlin violated mandatory duties described in the DHR’s Child Protective Services Policies and Procedures Manual. ‘The mandates of the DHR Manual ... are precisely the sort of “detailed rules or regulations” that State agents cannot ignore, except at their peril.’ Gowens v. Tys., 948 So.2d 513, 527 (Ala.2006).”
On January 27, 2009, Sumerlin filed a petition for a writ of mandamus with this Court, requesting an order directing the trial court to enter a summary judgment for her based on State-agent immunity.

Standard of Revieiv

‘ “ ‘While the general rule is that denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus.’ Ex parte Rizk, 791 So.2d 911, 912 (Ala.2000). A writ of mandamus is an extraordinary remedy available only when there is: ‘(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.’ Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001).” ’
“Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006) (quoting Ex parte Nall, 879 So.2d 541, 543 (Ala.2003)).”
Ex parte Sawyer, 984 So.2d 1100, 1105-06 (Ala.2007).

Analysis

Sumerlin contends that the trial court erred when it denied her summary-judgment motion because, she says, she is entitled to State-agent immunity. Willi- *1184 ford contends that Sumerlin is not entitled to State-agent immunity because, she says, Sumerlin acted beyond her authority or under a mistaken interpretation of law when she violated mandatory duties described in the DHR manual and standards set out in the R.C. consent decree.
“ ‘State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities.’ Ex parte Hayles, 852 So.2d 117, 122 (Ala.2002). In Ex parte Cranman, 792 So.2d 392 (Ala.2000), a plurality of this Court articulated the following test for State-agent immunity:
“ ‘A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“ ‘(1) formulating plans, policies, or designs; or
“ ‘(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“ ‘(a) making administrative adjudications;
“ ‘(b) allocating resources;
“ ‘(c) negotiating contracts;
“ ‘(d) hiring, firing, transferring, assigning, or supervising personnel; or
“ ‘(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“ ‘(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“ ‘(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“ ‘Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“ ‘(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“ ‘(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.’
“Cranman, 792 So.2d at 405 .... The Court adopted the Cranman test for State-agent immunity in Ex parte Butts, 775 So.2d 173, 177-78 (Ala.2000).
[[Image here]]
“ ‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’ Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable. The exception being argued here is that ‘the State *1185 agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.’ 946 So.2d at 452. One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed ‘“to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.” ’ Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003) (quoting Ex parte Butts, 775 So.2d at 178).
[[Image here]]
“In Giambrone v. Douglas, supra, and Howard v. City of Atmore, 887 So.2d 201 (Ala.2003), this Court discussed the violation-of-rules basis for denying a State agent immunity. We described those cases in Gowens v. Tys. [S.], 948 So.2d 513, 524-26 (Ala.2006):
‘““The complaint in Giambrone [v. Douglas, 874 So.2d 1046 (Ala.2003),] sought compensation for injuries suffered by 15-year-old Jake Giambrone, a member of the wrestling team, in an impromptu wrestling match with Michael Douglas, the head wrestling coach for Auburn High School. 874 So.2d at 1049. Douglas outweighed Giambrone, who was a freshman, by approximately 70 pounds. Id. The trial court entered a summary judgment in favor of Douglas on the ground of State-agent immunity.
“ ‘ “In this Court, the appellant argued that the summary judgment was improper, because there was evidence indicating that ‘[Douglas] violated the competition guidelines as promulgated by the National Federation of Wrestling (“NFW”); and ... engaged in “inequitable competition” with Jake in violation of the code of conduct contained in the Alabama High School Athletic Directors and Coaches Association Directories (“the Athletic Directories”).’ 874 So.2d at 1051 (emphasis added). This Court agreed with that argument and reversed the summary judgment. 874 So.2d at 1057.
“‘“In doing so, the Court noted that, as a general principle, ‘Douglas was permitted to exercise broad judgment in the education of his students.’ 874 So.2d at 1053. It explained, however, that Douglas’s supervisor, the athletic director, had ‘instructed the coaches ... to follow the guidelines in the Athletic Directories,’ and that he had ‘provided Douglas with a book containing rules promulgated by the NFW in order to make sure that Douglas knew the rules for conducting wrestling matches.’ 874 So.2d at 1054. The Court stated:
“ ‘ “ ‘Although [the athletic director] was not directed by the [Auburn City Board of Education] to impose on the coaches at Auburn High School the guidelines and rules of the ... NFW and the Athletic Directories, it was within the exercise of his judgment to “insist” that the coaches comply with those guidelines and rules.
“““Therefore, Douglas’s “broad authority” to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed by [the athletic director].’
“ ‘ “874 So.2d at 1054. The Court concluded:
“ ‘ “ ‘The guidelines and rules removed Douglas’s judgment in determining whether he should participate in a “full speed” challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted *1186 the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an “inequitable” challenge match, thereby failing to discharge his duties pursuant to “detailed mies or regulations,” we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not meet his burden of establishing that his actions and decisions involved functions that entitled him to immunity.’ ”
“ ‘Howard [v. City of Atmore,] 887 So.2d [201,] 208 [(Ala.2003)] (emphasis added in Howard).’ ”
Ex parte Kennedy, 992 So.2d 1276, 1280-85 (Ala.2008) (some emphasis omitted).
Williford agrees that Sumerlin has made a sufficient showing that the claims against Sumerlin arise from actions taken by her while executing her work responsibilities as a State employee. Williford, however, contends that Sumerlin is not entitled to State-agent immunity because, she says, Sumerlin “acted beyond her authority” or “under a mistaken interpretation of law.” Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000). According to Williford, Sumer-lin acted beyond her authority by violating detailed and mandatory DHR policies in the DHR manual and by violating detailed and mandatory directives in the R.C. consent decree. Williford argues that Sumer-lin acted beyond her authority in three ways.
First, Williford contends that she satisfied her burden of establishing that Sumerlin acted beyond her authority by violating the provisions of the DHR manual when she did not immediately investigate or immediately assign someone to investigate Terry’s suspected abuse. According to Williford, when Sumerlin received the suspected-abuse report regarding Terry on Friday afternoon, September 6, an immediate response was required. Williford maintains that Sumerlin acted beyond her authority by not assigning a caseworker to investigate the allegation until Monday, September 9.
The DHR manual provides that the DHR response times within which an in-person initial contact must be made with children who are allegedly at risk of serious harm are “immediate” or “within five (5) calendar days.” “Immediate” response time is defined as “as soon as possible after a report is received, but no later than twelve (12) hours from receipt of the intake information.” A supervisor is involved in determining whether a response time is to be “immediate” or “within five (5) calendar days.” An “immediate” response time is required by the child-welfare staff “when intake information indicates serious harm will likely occur within twenty-four (24) hours to the children identified in the report as allegedly abused or neglected.” The manual further provides that factors that suggest a child may be at risk of serious harm within 24 hours include, but are not limited to:
“ — Child death report is received with alleged abuse/neglect as the cause, and there are other vulnerable children in the home;
“ — Child is under age six (6) years and the alleged abuse/neglect is attributed to the parents’ or primary caregivers’ substance abuse, mental illness, mental retardation, or family violence;
“ — Child is being hit, beaten, severely deprived notv;
“ — Child is unsupervised or alone now;
“ — Child is in life threatening living arrangements now;
“ — Serious allegations have been reported and a child is accessible to the person *1187 allegedly responsible for abuse/neglect or accessibility to the person is unknown;
“ — Serious allegations have been reported and the child/family situation may or will change quickly;
“ — Allegations involve failure to thrive;
“ — Allegations involve medical neglect of handicapped infants;
“ — Parents/primary caregivers are failing to seek medical care for a health problem which, if left untreated, could cause serious harm;
“ — Parents/primary caregivers have been reported as being under the influence of substances ?iotu;
“ — Parents/primary caregivers’ whereabouts are unknown; and
“ — There is a history of CA/N [child abuse/neglect] reports which suggest the children may be at risk of serious harm flow.”
(Emphasis in original.)
Sumerlin stated in her deposition that on Friday, September 6, when she received the initial-intake information that designated the need for an “immediate” response in Terry’s case, she did not have an investigator available. Therefore, recognizing the exigency of the circumstances, she contacted Children’s Hospital to further evaluate Terry’s case and to determine if Terry was at risk of serious harm at that time and how best to address Terry’s needs. After talking with Hawkins, the medical social worker at Children’s Hospital, she learned that Terry would remain in the hospital until Monday, September 9; therefore, Terry was not unsupervised or alone, and he was not in a life-threatening living arrangement. Because Terry was in a safe environment, Surnerlin exercised her judgment and determined that an investigator could be assigned to Terry’s case on Monday when the threat of serious harm to Terry might return. The materials before us support a finding that Sumerlin did not ignore her responsibility; rather, she exercised her judgment in her supervisory capacity to deal with exigent circumstances. Indeed, nothing before us indicates that Sumerlin exceeded the scope of her discretion in light of the facts that she had no personnel to assign to Terry’s case on Friday afternoon and that Terry was not at that time in a life-threatening situation. Consequently, Williford has not established that Sumerlin acted beyond hér authority in this regard.
Next, Williford maintains that Sumerlin is not entitled to State-agent immunity because, she says, Sumerlin acted beyond her authority by failing to review and approve Hood’s initial assessment of Terry’s case. The DHR manual provides under the initial-assessment section:
“CA/N [child abuse/neglect] Initial Assessment
“VI. Review, Approval, and Assignment for On-going Services
“1. Supervisory Review
“Supervisors shall review all initial assessments to determine that:
“ — child welfare staff have complied with the general requirements and information collection protocol;
“ — any deviations have received supervisory concurrence and been adequately documented;
“ — documented information is pertinent and sufficient to make the required initial assessment decisions.”
The DHR manual also provides the following time frame for completion of initial assessments:
“B. Time Frame For Completion
“1. Initial Assessments
“Initial assessments shall be completed within ninety (90) days from the date *1188 the intake information is received. An initial assessment is considered complete when:
“ — The general requirements and information collection protocol have been followed;
“ — Analysis and decision-making have occurred;
“ — Documentation has been completed and due process rights have been initiated (including entry of the preliminary CA/N [child abuse/neglect] disposition into the Central Registry); and
“ — Supervisory reviews and approval has occurred.”
The initial-intake call of the suspected abuse of Terry occurred on September 6, 2002; Teiry died on November 3, 2002. It appears undisputed that Hood did not daily document her investigative findings in DHR’s computer system. Indeed, it appears that she did not input the data regarding the Terry investigation until November 4, 2002, the day after Terry died.
In her deposition, Sumerlin explained that she had daily meetings with Hood about her initial findings with regard to Terry and that Sumerlin agreed with Hood’s determinations. She stated that because Hood’s assessment was ongoing, i.e., that Terry’s initial assessment was not completed[3] and because Hood had not documented her findings in the DHR computer system, Sumerlin had not documented her official supervisory approval of Hood’s recommendation. Because the DHR manual provides 90 days for completion of an initial assessment and 90 days had not passed from the initial intake in Terry’s case, Williford has not established that Sumerlin acted beyond her authority by not having completed and documented her supervisory review of Hood’s initial assessment.[4]
Last, Williford contends that Sum-erlin is not entitled to State-agent immunity because, she says, Sumerlin acted beyond her authority or engaged in a mistaken interpretation of the law when she assigned the Terry case to Hood for investigation. According to Williford, Hood’s caseload exceeded the caseload mandate set forth in the R.C. consent decree. The R.C. consent decree mandated *1189 one investigation worker for every 13.5 child-abuse and neglect reports. Although Hood stated in her deposition that during the fall of 2002 she was assigned between 35 to 50 open cases, the materials before us indicate that for the month of September 2002 Hood had 19 open cases.
In support of her contention that she did not violate the mandates of the R.C.. consent decree, Sumerlin provided an affidavit from Mike Salter, director of DHR’s Division of Management & Fiscal Analysis. He explained the requirements of the R.C. consent decree with regard to caseload standards, stating:
“Each county was to determine the monthly average caseloads and document the caseload for each worker. Every three months the counties were to report the caseload data to the DHR State Office. If the county had more than ten percent of its workers exceeding the caseload standards, the county would file an exception report with the DHR State Office identifying the reasons for the overages and actions that would be taken to reduce them within the next thirty days. If a county reported an excess of the caseload standards for two consecutive quarters, the state and county offices would analyze the problem together to determine the factors that were causing the overage and take any needed corrective action within thirty days. Thus, the county and state offices had seven months to identify caseload problems and implement corrective action to solve the issue rather than one month.
[[Image here]]
“In April of 1999, an R.C. Child Welfare Staffing Committee (hereinafter ‘staffing committee’) was established to monitor county staffing on a monthly basis or more frequently if necessary, to ensure that counties were meeting the standards. In addition, a computer reporting system was developed whereby counties could enter data concerning the number of cases their workers had and send this data to the DHR State Office where it would be compiled into a report. When it appeared to the committee that a county may have had inadequate staff, an in-depth look at the county staffing level is undertaken.
“The Office of Management and Fiscal Analysis produced detailed information about the staffing need in the county based on the caseload counts. The data was calculated using a six-month average to avoid having temporary spikes or dips in caseloads changing a county staffing level from month to month. When it became apparent that a county was experiencing staffing shortages based upon the averages for the county, its allocation was increased and the county would then be given authority to hire additional staff. However, a county director or a county supervisor did not determine the allocation for staffing.
“It was not possible to conclude that a county was not in compliance with the Staffing Order without a review of what a worker’s caseloads were for several consecutive months. In this case, Joann Hood, a child abuse and neglect worker, was over caseload standards for September of 2002, but under caseload standards for the immediate following month of October of 2002.
“While it is true that, at any given point in time, the counties may have workers that have one or more cases over the caseload standards, the same counties may also have workers who are carrying fewer cases than required under the standards. Counties would be authorized to hire a sufficient number of workers to meet or exceed the need *1190 shown by the caseloads in that county. However, in any given month, an individual worker in that county may be under or over the standards depending on the number of cases the county received that month and the number of cases the county closed that month. The only way a county director could insure that workers never exceeded the standards would be to constantly move the cases from worker to worker every month so that the caseloads were always equal. However, optimal outcomes for children would not be achieved by assigning them a new worker every few months to meet a caseload standard.
“On January 16, 2007, the federal court determined that DHR had complied substantially with the R.C. Decree and granted [DHR’s] motion to terminate the R.C. Consent Decree ....”
In light of the fact that the R.C. consent decree provided averages for caseloads over a period of time and in light of the fact that the evidence indicates that Hood’s average caseload over the acceptable period did not exceed the mandates of the R.C. consent decree, Williford has failed to establish that Sumerlin acted beyond her authority or that she acted under a mistaken interpretation of the law in this regard.

Conclusion

Based on the foregoing, we conclude that Williford has not established that Sumerlin is not entitled to State-agent immunity. Consequently, a summary judgment is proper for Sumerlin on the ground of State-agent immunity. We, therefore, issue the writ and direct the Jefferson Circuit Court to set aside its order denying Sumerlin’s summary-judgment motion and to enter a summary judgment for Sumerlin.
APPLICATION GRANTED; OPINION OF APRIL 24, 2009, WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED; WRIT ISSUED.
COBB, C.J., and LYONS, WOODALL, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ, concur.

. Terry’s parents were divorced. His mother had legal custody; his father had supervised visitation rights.

. In 1998, R.C., an eight-year-old boy who had been placed in the custody of the Alabama DHR after he had been abused by his mother and neglected by his father, filed a class-action lawsuit against the commissioner of the Alabama DHR. R.C. v. Walley, 390 F.Supp.2d 1030 (M.D.Ala.2005). As the class representative, R.C. challenged the conditions and practices of Alabama’s child-welfare system. After two years of litigation, the parties negotiated a consent decree that was approved by the court, which provided, among other things, mandates with regard to child-welfare-worker caseloads.

. Williford urges that Terry’s case was closed because, she says, Hood had stopped investigating the case. Investigation, however, is only a portion of the initial assessment and continues until the initial assessment is completed. An initial assessment, as provided in the DHR manual, is not complete until the documentation has been completed and the preliminary child-abuse/neglect disposition is entered into the central registry. Hood was still working on the initial assessment, and Sumerlin could not review Hood's initial assessment until Hood completed the documentation. Therefore, the materials before us support a finding that Terry’s case was not closed.

. Within this argument, Williford appears to maintain that Sumerlin did not adequately supervise Hood. On rehearing, she states: “Sumerlin's and Hood’s premature and incorrect conclusion that additional investigation was not necessary is in direct violation of the DHR manual.” An incorrect conclusion, however, does not establish that Sumerlin exceeded the scope of her authority in supervising Hood. Additionally, as we recognized in Gowens v. Tys. S., 948 So.2d 513, 532 (Ala.2006):
"The plaintiffs' theory of the case is that [DHR] conducted a negligent investigation of the [alleged abuse], and their theory against [the supervisor], specifically, is that she acted negligently in supervising [the caseworker's] investigation. On its face, their theory against [the supervisor] is 'contrary to well-established immunity principles.’ Vick v. Sawyer, 936 So.2d [517], 523 [(Ala.2006)]. See also Love v. Davis, 14 F.Supp.2d 1273, 1278 (M.D.Ala.1998) ('[B]ecause supervisory and training functions require constant decision-making, they are, for the most part, discretionary.’).”