MURDOCK, Justice.
Becky Ingram ánd Nancy Wilkinson (sometimes hereinafter collectively referred to as “the teachers”) petition this Court for a writ of mandamus directing the Tuscaloosa Circuit Court to vacate its order denying their motion for a summary judgment based on State-agent immunity as to all claims asserted against them in an action filed by L.L., by'and through her mother, and to enter a summary judgment in their favor. We grant the petition as to Wilkinson and deny the petition as to Ingram.
I. Facts and Procedural History ’
Oak Hill School is a self-contained facility operated within the Tuscaloosa City School System and designated for students with significant disabilities. At the time of the incident at issue, L.L. was an 11-year-old eighth-grade student at Oak Hill. L.L., who suffers from spina bifida, is paralyzed from the waist down; she is confined to a wheelchair; she does not have full use of her arms and hands; she requires a urinary catheter; and she wears a diaper. L.L. also has significant mental impairment: she has an I.Q. of 55, impaired speech, and other mental complications.
The other eighth-grade student involved in the incident in question, M.M., has a chromosome-2 deletion, which results in mental retardation, verbal disability, shortened limbs, and impaired manual dexterity. M.M. often communicates by grunting and shaking his head; he also signs to communicate, but he uses words, too. In 2007 when the incident underlying the case occurred, Ingram, was the eighth-grade science teacher and Wilkinson was a teacher’s aide (also referred to as a “paraprofessional”) assigned to Ingram’s class.
Before the incident in May 2007, M.M. had a history of aggressive behavior toward teachers and other students. On November 6, 2006, M.M. was suspended from the school 'bus for the remainder of the month of November for rude, discourteous, and annoying behavior and unacceptable language, which included sexual references and gestures. On November 9, 2006, Melissa Mitchell, a reading and language arts teacher at Oak Hill, referred M.M. to the *223 principal, Suzanne Sterling, because of his disruptive behavior. Specifically, M.M. tried to remove his belt and indicated that he was going to use it on Mitchell, and he used an obscene gesture toward Mitchell. Mitchell noted to Sterling that “this behavior has been going on for a while.” On November 16, 2006, M.M. was suspended from Oak Hill for two days for “repeated offenses” of threatening others, making obscene gestures toward faculty and staff members, and being a disruption on the school bus. On November 29, 2006, Sterling held a conference with M.M. during which she warned him against “touching others,” to keep his hands to himself, and not to “say the wrong things” because such behavior could get him suspended from school. On December 13, 2006, M.M. was suspended for three weeks from the school bus for “shooting the bird,” biting, hitting^ and pinching other students, and telling the bus driver' “f— you” while pulling on his own privates. On April 19, 2007, Wilkinson' found M.M. standing in front of A.J., a female classmate who uses a walker and who needs assistance when she uses the bathroom, in the hallway between the lunchroom and Ingram’s classroom, and A.J.’s pants were pulled down. When M.M. saw Wilkinson he ran around the corner as if to hide. When Wilkinson asked M.M. what he was doing, he pointed to his private area and began to whine and cry. M.M. was- suspended for the incident involving A.J., and Ingram was told about it, although she testified in her affidavit that the incident, “as it was reported to me, [was not] sexual in nature.”
School officials had a conference with M.M.’s mother about the incident with A.J. M.M.’s mother testified in an affidavit that “I was told by Ms. Sterling and Ms. Ingram and other school officials that my son admitted to them that he had pulled the student’s clothes down and had -attempted some sort of sexual contact.” M.M.’s mother also stated that “[r]epeatedly, prior to [the incident involving L.L.], when I met with my son’s teachers and school officials, including Mrs. Sterling and Mrs. Ingram, I told them that I did not believe they were giving my son the constant supervision he needed to help control his increasing sexual misbehavior.” Ingram admitted in her affidavit that “[w]hen M.M. became frustrated or angry, he would make inappropriate gestures toward me or Ms. Wilkinson, such as ‘shooting the bird,’ touching his hand to his lips and then to his bottom, or point to his groin area.”
Dr. Ashraf Syed, a child neurologist, testified by affidavit that he had been treating M.M. since 2002. He stated that on March 22, 2007, M.M.’s mother contacted him and reported that “M.M. was sexually aggressive and reported to me that M.M. was having problems with sexual aggression in school.” Dr. Syed stated that “a treatment plan was developed for M.M. to' manage his sexual aggression. Because there is no specific medication for these types of aggression, I recommended an aide be assigned to him to prevent any inappropriate or indecent behavior.” Dr. Syed also stated that,' “[g]iven M.M.’s severe mental retardation, he does not understand the nature of his actions in the context of ‘sexually aggressive behavior’- and needs an aide to monitor his actions.” There is no record, however, that Dr. Syed ever communicated with - Oak Hill school officials about M.M.’s behavior. '
It is undisputed that the doors tó all the rooms facing hallways at Oak Hill were supposed to be set to lock automatically when they closed. Ingram testified in her deposition that Oak Hill administration “wanted . us to keep every door to the hallway locked.” In their depositions, both Deborah Andérsori, director of special education for the Tuscaloosa City Schools, and Sterling confirmed that Oak Hill policy *224 required that all .classroom and office doors that opened to hallways remain locked. It is also undisputed that Ingram’s science classroom was next tq Mitchell’s classroom and that Mitchell’s classroom had a bathroom attached to it. There was a shared office between Ingram’s classroom and Mitchell’s classroom. A person could access either of those classrooms by directly entering the hallway door to the classroom or by entering, the hallway door to the shared office and then opening the connecting door between the office and the classroom.
On May 7, 20.07, Ingram’s class of 11 students was returning to her classroom from the lunchroom. In order to reach Ingram’s classroom, students had to proceed down a main hallway past the doors to several other classro'oms, including the main door to Mitchell’s classroom, which was on the left side of the main hallway as the students returned from the lunchroom. To reach Ingram’s classroom, the students would pass Mitchell’s classroom and then make two 45-degree turns and proceed, a shorter distance down a secondary hallway to Ingram’s classroom, which would be on the left side of the secondary hallway.
Between the two 45-degree turns was a relatively short wall in which was located the- door to the small office shared by Ingram’s and Mitchell’s classrooms.
. Ingram testified that, before she left the lunchroom with the students, Wilkinson told Ingram that Wilkinson was going to stop in the hallway along the way to help A.J. go to the bathroom. Wilkinson also was going to assist a male student in a wheelchair. According to the teachers, Ingram led the students from the front of the line and Wilkinson was at the back of the line as the students walked down the main hallway toward Ingram’s classroom.
The above-described procedure for transitioning the students from the lunchroom to the science classroom was performed pursuant to Oak Hill policy. The Oak Hill School Faculty Handbook provided: “Students should always be accompanied by adults during class change and should never be left unattended in the classroom or locke[r] rooms. There are no exceptions.” Additionally, Ingram testified that it “is an Oak Hill policy .that the- teacher is at the front of the line and the para[professional] is at the back” when students are transitioned through the building. Sterling confirmed this transition policy. - ■
According to Ingram,- she led .the students down the main hallway,, and, when she arrived at the corner to the secondary hallway leading to the science classroom, she looked back and confirmed that all the students were in the line—including M.M. and L.L.—before she walked down the secondary hallway and arrived at the door' to the science classroom. ■ She then unlocked the door to the science classroom, and walked into the classroom, and her students followed immediately behind her.
Ingram testified that she had expected Wilkinson to take A.J. to a bathroom on the main hallway, specifically the bathroom
“next to the Home Economics room, which is on the main hall between the dining area and my classroom. I expected, as is the normal procedure, that Ms. Wilkinson would wait outside that bathroom where she would have been able to see the other-students in the hall before they turned the corner to [my] classroom. ... I later learned that the restroom in the main hall was occupied, and that Ms.- Wilkinson instead had to take the student to the girls’ restroom on the hall toward the gym. She came into the classroom three to five minutes after I did, with the student she had been as-, sisting.”.-
*225 According to Wilkinson, when she started down the main hallway with A.J. and the male student in a wheelchair, A.J. started to act upset, which usually indicated urgency in her need to go to the bathroom.[1] Wilkinson testified that it was then that she told Ingram that she was going to take A.J. to the bathroom and that Ingram acknowledged this and continued down the main hallway with the other students. Wilkinson stated that she went immediately to the restroom near the gym with A.J. and the male student in a wheelchair. Wilkinson testified that it took “just a few minutes” to take A.J. to the restroom. Wilkinson then took the male student in a wheelchair down another hallway to a room where an aide could change his diaper. Wilkinson left the male student with the aide and returned to the science classroom with A.J. Wilkinson testified that she did not know where M.M. and L.L. were during this time.
Mitchell testified , that she returned to her classroom from lunch at 12:45. p.m. In two statements recounting the events, Mitchell indicated that she entered her classroom through the hallway door into the shared office and, from there, through the connecting door to her classroom. In one of those statements, Mitchell recalled that she found the hallway door to the office “ajar” and.then discovered that the connecting door to the classroom also was open. In her deposition, however, Mitchell testified that she entered her classroom by unlocking her classroom door located on the main hallway. Whén she entered the classroom, Mitchell observed M.M. leaving the bathroom in her classroom. She stated that M.M. had his hands on his pants as if he . had been fastening them. Mitchell asked M.M. what he was doing in the bathroom, but he did not answer. She told M.M. to return to his classroom and he left: Mitchell then heard noises coming from the bathroom, and she went to investigate. Mitchell discovered L,.L. lying on the toilet with her legs .dangling, her pants down around her ankles with her genitals fully exposed, her shirt up around her neck and one arm out of a sleeve of her shirt, and. her^ bra pulled down, exposing one breast. Mitchell testified that she asked L.L. what M.M. had done and that L.L. stated that M.M. “was messing with her.” Mitchell asked L.L. how M.M. was messing with her and L.L. pointed to her genital area. Mitchell then left the bathroom to find another witness and to get some help.
After Wilkinson returned to the science classroom, Ingram left the classroom to take a document to Sterling’s office. Ingram testified that while she was in the classroom she had not noticed that M.M. and L.L. had not returned to the classroom from the lunchroom because she' was focused on other students. Ingram testified that she was unable to find Sterling and that she started to return to her classroom. As she was returning,' Mitchell got Ingram’s attention and asked'her to come into the bathroom in Mitchell’s classroom. Ingram then witnessed L.L. in the same condition in which Mitchell had discovered her. Ingram proceeded to try to console L.L., who was very upset.
, Several minutes later M.M. was questioned by school officials. M.M. immediately began to sign that he was sorry. When he was asked what he ’was sorry for, M.M. *226 pointed to his private area. M.M. was asked three times if he had had sex with L.L., and each time he nodded his head in the affirmative. L.L. was examined by. a physician later that day, however, and no evidence of sexual contact was found.
L.L. introduced video-surveillance footage at Oak Hill from the date of the incident. The working cameras during that day showed the cafeteria and all secondary hallways that branch off of the main hallway, but there was no operational camera showing the main hallway. The video-surveillance footage showed the students leaving the cafeteria, but they were not in an organized line. It showed Wilkinson in the cafeteria with A. J. and the male student in a wheelchair at a table after the other students had left the cafeteria. It also showed Wilkinson leaving the cafeteria with A.J. and the male stpdent in the wheelchair. Forty-five seconds later, the camera in one branch hallway showed, Wilkinson parking the male student in front of a door and.knocking on the door and then leaving. The door opened and the male student was moved inside the room. During the same period, the camera in the science classroom hallway showed students coming down the hallway toward the science classroom with no adult leading them. When the first students arrived at the door of the science classroom, the door was closed. The first students to arrive waited át the door for a moment and then the door opened from the inside and the students began to walk into the classroom. One male student walked to the open classroom door and stood there for a full minute before walking back down the hallway and was not shown to return to the classroom. Five minutes after the students entered the science classroom, Wilkinson walked into the science classroom with A.J. just behind her. Two minutes after Wilkinson returned to the science classroom, the cafeteria camera showed Ingram standing in the cafeteria for two minutes holding a sheet of paper and then walking out of the cafeteria in a direction opposite to the main hallway. A camera in another branch hallway then showed Ingram walking to the door of a room, opening the door and checking inside the room, and then leaving in the direction from which she had come. A moment later, Ingram is seen walking back through the cafeteria. Ingram never appeared on the video footage of the science-classroom hallway throughout the entire 10-minute period shown in the video footage.
L.L. did not return to Oak Hill for the remainder of the 2006-2007 school year after this incident, and, at the request of her parents, she was transferred to another school the following school year.
L.L., by and through her mother and next friend L.L., originally filed an action in the United States District Court for the Northern District of Alabama against the Tuscaloosa City Board of Education, Sterling, and Ingram, alleging violations of her civil rights under 42 U.S.C: § 1983; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; Section 604 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Americans with Disabilities Act, 42 U.S.C. § 12132, for conduct that she said effectively denied L.L. safe access to Oak Hill, a federally assisted public facility. She also brought Alabama state-law claims, asking the federal court to exercise its supplemental jurisdiction. The federal district court entered a summary judgment in favor of all defendants on L.L.’s federal claims. It declined to exercise supplemental jurisdiction over L.L.’s state-law claims.
In April 2013, L.L. filed an action by and through her mother and next friend in the Tuscaloosa Circuit Court against Sterling, Mitchell, Ingram, and Wilkinson in *227 their individual capacities, alleging negligent, wanton, and willful failure to perform ministerial tasks and other state-law claims. The defendants filed a motion for a summary judgment based on State-agent immunity. The circuit court entered a summary judgment in favor of Sterling and Mitchell, but it denied the summary-judgment motion as to Ingram and Wilkinson. Specifically, the circuit court concluded that L.L. had
“failed to offer any evidence that any defendant acted willfully, maliciously, fraudulently, or in bad faith. The only remaining issue is whether any defendant acted beyond her authority and is therefore not entitled to state agent immunity when she failed to discharge duties pursuant to detailed rules or regulation.
“4. [L.L.] failed to present sufficient evidence that defendants. Suzanne Sterling and Melissa Mitchell acted beyond their authority.
“5. Viewing the evidentiary submissions of the parties in the light most favorable to the non-movant, the court for purpose of summary judgment finds that Defendant Becky Ingram acted beyond her authority when she violated the following policies:
“1. ‘Students should always be accompanied by adults during class change and should never be left unattended in the classroom or locker rooms. There are no exceptions.’
“2. Policies and procedures at-1 Oak Hill School require that all classroom and office doors connected to hallways remain locked.
“3. Oak Hill policies require staff members to be at the front and end of each line when transitioning students through-the building.
“6. Again viewing the evidentiary submissions of the parties in the light most favorable to the non-movant, the court for purpose of summary judgment finds that Defendant Nancy Wilkinson acted beyond her authority when she violated the following policies:
“1. ‘Students should always be ¿ccom-■panied by adults during class change and should never be left unattended in the classroom or locker rooms. There are no exceptiohs.’
“2. Oak Hill policies require staff members to be at the front and end of each line when transitioning students through the building .... ”
Ingram and Wilkinson filed this petition for a writ of mandamus asking this Court to direct the circuit court to enter a summary judgment in their favor on the basis of State-agent immunity.
II. Standard of Review
“‘While the. general rule is that denial of a summary-judgment motion is not immediately reviewable by an appellate court, the exception to the general rule is that a denial of a motion for a summary judgment grounded on a claim of immunity is immediately reviewable by a petition for a writ of mandamus .... ’
“Ex parte Wood, 852 So.2d 705, 708 (Ala. 2002).
“ ‘A writ of mandamus is an extraordinary remedy, and is appropriate when the petitioner can show (1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.’
“Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001).
“ ‘This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala. 2003). *228 We apply the same standard of review as the trial court applied. Specifically, we must determine whether the mov-ant has made a prima facie-showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce “substantial evidence” as "to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12. “[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).
“Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala. 2004).”
Ex parte Jackson Cty. Bd. of Educ., 4 So.3d 1099, 1101-02 (Ala. 2008).
III. Analysis
“ ‘In Ex parte Cranman, 792 So.2d 392 (Ala. 2000), a plurality of this Court restated the test for determining when a State employee is entitled to State-agent immunity: .
“ ‘ “A State agent shall be immune from civil liability in-his or her person- • al capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
““‘(1) formulating plans, policies, or designs; - or
““‘(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“ ‘ “(a) making administrative adjudications;
' “ ‘ “(b) allocating resources; ■ '
“ ‘ “(c) negotiating contracts;
“ ‘ “(d) hiring, firing, transferring, assigning, supervising personnel; or
“ ‘ “(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
‘““(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“‘“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of -unsound mind, or educating students. ■ ■
“ ‘ “Notwithstanding anything to the contrary in the foregoing statement of the rule, a State-agent shall not be immune from civil liability-in his or her personal capacity
‘““(1) when the Constitution or laws of the United States, Or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“ ‘ “(2); when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, *229 ■ or under a mistaken interpretation of the law.’
‘792 So. 2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court in Ex parte Rizk, 791 So.2d 911 (Ala. 2000), and Ex parte Butts, 775 So.2d 173 (Ala. 2000).
“ ‘Additionally, this Court has stated:
“‘“This Court has established a ‘burden-shifting’ process when a party raises the defensé of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden' of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority, Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998). ‘A State agent acts beyond authority and is therefore not immune when he or she “fail[s] to discharge duties pursuant to detailed rules , or regulations, such as those stated on a checklist.”’ Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000)).”
“ ‘Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006).’ ”
Ex parte Jones, 52 So.3d 475, 479-80 (Ala. 2010) (quoting Ex parte Yancey, 8 So.3d 299, 304-05 (Ala. 2008)).
The teachers argue that the rules in question are not sufficiently detailed to establish that the teachers acted “beyond their-authority” in regard to the circumstances with which they were confronted in this case. The teachers argue, in the alternative, that this Court should overrule a number of recent cases addressing the “beyond-authority” exception identified in Ex parte Cranman, 792 So.2d 392 (Ala. 2000).[2]
Although we decline today to overrule Cranman in the manner urged by the teachers, as to the first argument made by the teachers, wé do recognize that there must be a ' fact-intensive inquiry into whether a relevant guideline leaves room for the exercise "of any discretion or professional judgment by the employee in relation to the particular circumstances with which the employee may be presented. This understanding, in fact, underlay our recent decision in Ex parte Sumerlin, 26 So.3d 1178 (Ala. 2009).
In Sumerlin, this Court recognized the practical reality that workplace regulations or guidelines cannot always anticipate all circumstances and exigencies. Specifically, in Sumerlin, this Court considered whether a Jefferson.County Department of Human Resources (“DHR”) supervisor acted beyond her authority by failing to follow policies in the DHR Policy Manual. A 12-month-old child, Austin Terry, was admitted to Children’s Hospital on Friday September 6, 2002, with injuries indicating child abuse. A social .worker notified DHR, designated the case as one requiring an “immediate” response, and recommended *230 to Sumerlin, a DHR supervisor, that Terry not be allowed to go home with his mother until DHR investigated. The DHR Policy .Manual required that “immediate” response cases be investigated “ ‘as soon as possible after a report is received, but no later than twelve (12) hours from receipt of the intake information.-’ ” 26 So.3d at 1186. But no investigator was available, so Sum-erlin did not assign one until Monday, September 9. She did determine that Terry could remain at Children’s Hospital until September 9 and asked that the hospital notify her before discharging him. Terry’s father also reported Terry’s injury to DHR on September 6. The on-call DHR worker who responded learned that the mother and her boyfriend had been with the child on the day of his injury and submitted a report that Terry should not return home with his mother. On September 9, Children’s Hospital contacted Sum-erlin to ascertain DHR’s plan. Sumerlin had not received the report recommending that Terry; not go home with his mother, and she allowed him to do so. Terry subsequently died from injuries inflicted by his mother’s boyfriend.
In a wrongful-death suit filed by Terry’s estate against Sumerlin and others, Sum-erlin moved for a summary judgment based on State-agent immunity. The plaintiff argued that Sumerlin was not entitled to immunity because, the plaintiff said, she acted beyond her authority in failing to follow detailed mandatory procedures in the DHR manual. The trial court denied Sumerlin’s motion, and she petitioned this Court for a writ of mandamus. Granting the petition, this Court stated:
“Because Terry was in a safe environment, Sumerlin exercised her judgment and determined that an investigator could be assigned to Terry’s case on Monday when the threat of serious harm to Terry might return. The materials before us support a finding that Sumer-lin did not ignore her responsibility; rather, she exercised her judgment in her supervisory capacity to deal with exigent circumstances. Indeed, nothing before us indicates that Sumerlin exceeded the scope of her discretion in light of the facts that she had no personnel to assign to Terry’s-case on Friday afternoon and that Terry was not at that time in a life-threatening situation. Consequently, [the plaintiff] has not established that Sumerlin acted beyond her authority in this regard.”
26 So.3d at 1187. See also Ex parte Coleman, 145 So.3d 751 (Ala. 2013) (holding, inter alia, that a statute did not deprive a police officer of the authority to use his professional judgment in regard to continuous versus intermittent use of his siren in a particular circumstance and that, therefore, the police officer had not acted “beyond his authority”).
A survey of other states reveals that few states, if any, analyze issues such as the one that arose in Sumerlin under a “beyond-authority” exception. Indeed, few states explicitly articulate a “beyond-authority” exception like the one applied in recent years by this Court to employee handbooks and similar workplace guidelines. Instead, other states typically frame the issue as simply whether the employee’s act or omission was within his or her “discretion,” given the particular circumstances presented. That is, does the handbook or guideline remove from the employee any room for professional judgment in the particular circumstances presented?
Indicative of the approach followed in most states, the Texas Supreme Court asks whether a statute is “sufficiently specific so as to leave no choice to an officer in the performance of [his or her] duties.” City of Lancaster v. Chambers, 883 S.W.2d 650, 655 (Tex. 1994) (emphasis added). *231 Similarly, in Downing v. Brown, 935 S.W.2d 112 (Tex. 1996), the court considered whether guidelines applicable to a public-school teacher deprived her of immunity. It analyzed the question, however, not in terms of whether, in fact, the teacher ultimately was deemed to have acted “beyond her authority” but whether the guideline was so specific to the particular circumstances presented as to leave no room for professional .judgment or discretion on the part of the teacher.
Downing itself was explained-in a subsequent case as follows:
“Ministerial acts are those ‘“[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.” ’ Ministerial actions require obedience to orders or the performance of a duty as to' which the actor has no choice. On the other hand, if an action involves personal deliberation, decision, and judgment, it is discretionary....
“Enriquez relies primarily on Downing v. Brown. In that case, the Texas Supreme Court- addressed whether a teacher’s maintenance of-classroom discipline in accordance with a school district’s policy’s Discipline Management Plan was ministerial or discretionary. In finding that the teacher possessed immunity, the .Court stated that the focus should be on whether maintaining classroom discipline was a discretionary function. ...”
Enriquez v. Khouri, 13 S.W.3d 458, 462 (Tex. Ct. App. 2000) (emphasis added; footnote omitted). In- a statement that sums up the issue as to the effect of the guidelines in this or any case, the court then explained:
“The Plan did not define the teacher’s responsibilities with such precision to leave nothing to the exercise of the teacher’s discretion or judgment. For example, the Plan did not inform her of what types of discipline to use, what forms of student misconduct should result in disciplinary sanctions, or when or where to discipline the students. The Court reasoned that each of these decisions, which Texas schools routinely leave to its teachers, required the use of professional .judgment and discretion.”
Enriquez, 13 S.W.3d at 462-63 (emphasis added; footnote omitted).
The same result is reached in federal qualified-immunity analysis by the requirement that the right the defendant is alleged to have violated must be “clearly established,” by which the federal cases mean not only that the rule must be one of which the employee has fair and clear notice, but it also must clearly apply to the particular circumstances:
“A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the ‘preexisting law dictates, that is, truly compel[s],’ the conclusion for all reasonable, similarly situated public officials that what Defen- . dant was doing violated Plaintiffs’.federal rights in the circumstances. [Lassiter v. Alabama A & M Univ., 28 F.3d 1146,] 1150 [ (11th Cir. 1994) ].
“... Two sets of circumstances may be ‘nearly’ the same, but ‘nearly5 can make a great legal difference at the-edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct,. in the specific circumstances, would clearly violate preexisting federal law.”..
Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1030-31 (11th Cir. 2001) (emphasis added).
*232 In Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002), the United States Court of Appeals for the Eleventh Circuit. explained what it referred to as a rule-of-obvious-elarity standard:
“In Saucier [v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001) ], the Supreme Court emphasized that determining whether a constitutional right was clearly established ‘must be undertaken in light of the specific context of the case, not as a broad general proposition.’ 533 U.S. at 201, 121 S.Ct. 2151; Lee [v. Ferraro], 284 F.3d [1188] at 1194 [(11th Cir. 2002)] (quoting Saucier' and stating ‘[t]his second inquiry “must be undertaken in light of the specific context of the ease, not as a broad general proposition” ’); see also Marsh v. Butler County 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc). ‘The relevant, disposi-tive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.’ Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (emphasis added). Saucier further instructs that ‘[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.’ Id. (emphasis added).”
Indicative of the simplified approach to individual state-employee immunity generally found in both state and federal jurisprudence, the ‘ Restatement (Second) of Torts § 895D(3) (1979) continues to frame the issue simply as whether “[a] public officer acting within the' general scope of his authority is ... engaged in- the exercise of a discretionary function.” Echoing the policy, concerns underlying this Court’s own analysis in Cranman, Comment b to § 895D of the Restatement (Second) of Torts elaborates on the reasons the law is reluctant to second-guess officials so long as the otherwise applicable rule leaves room for a reasonable exercise of judg-, ment in the circumstances presented:
“The complex process of the administration of government requires that officers and employees be charged with the duty of making decisions, either of law or of fact, and of' acting in accordance with their deteraiinations. ... The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits. This, together with the manifest unfairness of placing any person in a position in which he is required to exercise his judgment and at the same time is held responsible- according to the judgment of others, who may have no experience in the area and may be much less qualified than he to pass judgment in a discerning fashion or who may now be acting largely on the basis of hindsight, has led to a general rule that tort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.”
Restatement (Second) of Torts § 895D, cmt. b (1979) (emphasis added).
And in a similar vein, the United States Supreme Court has observed:
“Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages. Such officials as police officers or prison wardens, to say nothing of higher level-executives who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them, These officials are -subject to a *233 plethora of rules, ‘often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively.’ See P. Schuck, Suing Government 66 (1983). In these circumstances, officials should not err always on the side of caution. ‘[0]ffi-cials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office.’ Scheuer v. Rhodes, 416 U.S. [232], at 246 [ (1974) ].”
Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).
We cannot say that the policies at issue in this casé are sufficiently specific as to have removed from Wilkinson the measure of professional judgment and. discretion she used in the particular circumstance she faced. Among the policies urged against Wilkinson is. one that states that students shall not be left tmaccompanied in a classroom or locker room and thát this policy has “no exceptions.” But Wilkinson is not alleged to have violated this policy; she did not leave students unattended,'and her actions occurred in neither a classroom nor a locker room. There also is a written policy requiring that students be escorted back to their classrooms by teachers, but Ingram reportedly did escort the students back to their classroom, and we see no basis for holding Wilkinson, who served merely as an aide to the classroom teacher, Ingram, responsible for any failure by Ingram in her execution of this policy.
The allegations against Wilkinson center on evidence of a school policy calling for a teacher to be at the front of a line of students being transitioned, throughout the building and a paraprofessional to be at the back of the line. We first note that, in contrast to the policy against leaving students unaccompanied in a classroom or locker room, this policy does not come with a. “no-exceptions” addendum. Moreover, in this case, Wilkinson perceived an urgent need to take two students to the bathroom just before, or immediately after, Ingram began leading the rest of the class down the hall to their classroom. There were between 10 and 14 students in the class, and there is no dispute that Wilkinson had responsibility for aiding students with such personal needs. Compare D.S. v. County of Montgomery, Ala., 286 F.App’x 629, 639 n.12 (11th Cir. 2008) (not selected for publication in the Federal Reporter) (noting that “this is not a case in which the alleged failure to supervise a particular detainee could arguably be considered discretionary because of other concurrent duties imposed upon the Officers that conflicted with the duty, to supervise (for example, where an-officer must divert his., attention from one detainee to render medical aid to •another, or. where for some reason it is impossible or impracticable to watch all detainees simultaneously)”).And of course, Wilkinson was not aware in advance of the circumstances that would subsequently unfold so as to provide M.M. an opportunity for-time alone with L.L. We cannot say that the policy in question deprived Wilkinson of the authority to use her professional judgment to respond as she did to the exigent circumstances, presented to her. ¡ .
A’similar conclusion,' however, cannot be reached so readily for Ingram. For starters, Ingram testified that' she was informed by Wilkinson that Wilkinson needed to help two students to the bathroom while Ingram was still in the lunchroom with the other students. If she was informed of this while she and the students were still in the lunchroom, did the policy require her to hold the other students in the lunchroom until Wilkinson returned to assist with the transfer or until some other *234 teacher or aide could be recruited to help in Wilkinson’s place? For 'that matter, there is some inference that might be drawn from the videotape that Ingram was not in close proximity to the students as they left the lunchroom. Likewise, there is a genuine issue of fact as to what exactly Ingram did upon reaching the classroom area. Even if the students were following relatively closely behind her as she moved down the hall from the lunchroom to the classroom (and based on the record, a fact-finder would be free to find that they were not), it is possible'to infer from the evidence before us that Ingram entered her classroom by way of the common office doorway between the two classrooms and left the students unescorted in the hallway by themselves for a period, after which she then let them into the classroom through its main dóor. Similarly, the evidence allows the inference that, when Ingram did open the main door of the classroom to let the students in, she did so without accounting for all the students at that time or during the ensuing several minutes that she and some of the students were in the classroom. There also is evidence from which it reasonably may be deduced that, after using the common door, she left it unlocked. Based on the conflicting evidence and the obligation at this stage of the proceedings to view the record in the light most favorable to L.L., the nonmov-ant, we decline to. overturn . the circuit court’s decision to deny Ingram’s motion for a summary judgment.
PETITION GRANTED AS TO WILKINSON AND DENIED AS TO INGRAM; WRIT ISSUED.
Main and Wise, JJ., concur.
Stuart and Murdock, JJ., concur specially.
Parker and Bryan, JJ., concur in the-result.
Shaw, J., concurs in the result in part and dissents in part.

. Wilkinson testified in her deposition:
"Q. And so were you ever under die impression that 'AJ' was irritated because she needed to use the.bathroom?
"A. Yes, because that [is] usually how she, do[es it].
"Q. And at what point did you make the decision to take ‘AJ’ to the bathroom?
"A. After she wouldn’t move her walker and she started screaming in the hallway.’’

. As to this argument, at least one Justice on this Court has in fact argued in favor of limiting the beyond-authority exception under Cranman to instances where the employee is not acting in the general line and scope of his or her employment. See, e.g., Ex parte Watson, 37 So.3d 752, 765 (Ala. 2009) (Murdock, J., concurring in part and dissenting in part).