MURDOCK, Justice.
Andrew Hugine, Jr., Ph.D., Daniel Wims, Ph.D., and Mattie Thomas, Ph.D., petition this Court for a writ of mandamus directing the Madison Circuit Court to vacate its December 11, 2013, order that denied their requests for qualified immunity and State-agent immunity from all claims filed against them in their individual capacities by Regina Colston in an action stemming from the termination of Colston's employment at Alabama Agricultural and Mechanical University ("the University") and to enter a summary judgment in their favor. We grant the petition and issue the writ.
I. Facts and Procedural History
In 1979, Colston was hired as an instructor at the University to teach telecommunications for the School of Arts and Sciences in the Department of English, Foreign Languages, and Telecommunications. She taught broadcast journalism and other similar classes at the University continuously for the next 32 years. Colston holds a bachelor of arts degree in journalism and a master of arts degree in broadcast, film, and communication, both of which she earned from the University of Alabama. Colston has served multiple terms as an officer, and two terms as president, of the University's chapter of the Alabama Education Association ("the AEA"). L. Shefton Riggins, Ph.D., who served two terms on the University's Board of Trustees ("the Board"), stated in an affidavit that, in her representative capacity with the AEA, "Ms. Colston was well-known among the Board members as a strong advocate for the faculty and staff."
The University first hired Thomas as an English instructor in 1964. She was promoted to full professor in 1984. From 1978 until her retirement in July 2010, Thomas served as the chairperson of the University's Department of English, Foreign Languages, and Telecommunications. As the chairperson of the department, Thomas was responsible for planning and directing the work of her department, which included evaluating faculty within the department.
*36 Thomas was Colston's immediate supervisor during Colston's entire career at the University, with the exception of Colston's last year of employment with the University.
Hugine began his term as president of the University in July 2009. It is undisputed that, at the time Colston's employment was terminated, the president had the authority to make personnel decisions concerning University employees.
Wims was hired as provost and vice president for academic affairs of the University in April 2010. In that position, Wims has responsibility for administrative oversight of the divisions of Academic Affairs and Research at the University. Such oversight includes participation in decisions related to hiring, tenure, and termination of employment of University faculty.
In December 1991, Colston submitted to Thomas an application for promotion to associate professor. In a December 3, 1991, letter signed by Bessie Jones, Ph.D., the then interim vice president for academic affairs, the University's Office of Academic Affairs confirmed receiving Colston's application for promotion. On May 12, 1992, the Promotion and Tenure Committee recommended Colston for promotion to associate professor. A June 15, 1992, letter from Jones to Colston stated that Colston's "application for promotion to the rank of assistant professor has been approved."[1]
Colston alleges that in the fall of 1992 she submitted a similar application seeking tenure. Colston testified that in 1993 Jones told Colston that she "was receiving tenure in conjunction with her promotion."[2] Riggins testified that he recalled "learning when I first joined the Board [in 1994] that Ms. Regina Colston's tenure had been approved by the Board on the recommendation of Dr. Bessie Jones. I recall this, in part, because I was surprised that someone with only a Masters Degree would be approved for tenure."[3] Colston notes that an "Office of Academic Affairs Faculty-Unit Rank Report" dated January 7, 1994, from Virginia Caples, then vice president for academic affairs, indicated that Colston was tenured. A faculty-evaluation form dated May 15, 2002, signed by Thomas as Colston's supervisor, marked Colston as tenured.
Colston submitted 10 years of faculty-evaluation forms that she contends indicate that she was tenured. Thomas's assistant, Loretta Townsend, testified by affidavit, however, that the markings on those faculty-evaluation forms actually meant to convey that Colston held a "tenure-track"
*37 position, not that she was, in fact, tenured. Thomas testified in her deposition that she did not notice that the forms showed Colston as being tenured.
An October 25, 2006, letter from Beverly Edmond, Ph.D., the then provost and vice president for academic affairs, to Colston stated that Colston was "a tenured member of the faculty." In her deposition, Thomas admitted that she had received a copy of that letter. Attached to that letter was a 2006 employment contract for Colston indicating that she was tenured. Colston submitted as evidence a copy of that contract signed by Colston, Edmond, and then president of the University Robert Jennings, Ph.D. A January 18, 2008, self-study report of Colston's department stated that Colston was a tenured assistant professor at the University. Similarly, an "Academic Program Review Self Study Report" on the department dated February 21, 2011, listed Colston as a tenured professor.
Conversely, the petitioners note that the 1988 Faculty Handbook spelled out procedures for obtaining tenure that required review and approval of the Promotion and Tenure Committee's recommendations for tenure by the vice president for academic affairs and the president of the University. Those recommendations were then to be submitted to the Board for review and final approval of tenure.[4] The petitioners assert that the University has no record of Colston's filing an application for tenure, no record of the Promotion and Tenure Committee recommending Colston for tenure, no record of the vice president for academic affairs or the president approving a recommendation for Colston's tenure, and, notwithstanding Riggins's testimony, no record of the Board voting to grant Colston tenure. Colston produced no University records to the contrary. A note dated May 11, 2010, Thomas placed in Colston's employment file stated that "Colston is non-tenured."
In the 2007-2008 academic year, Thomas started rating Colston poorly in her faculty-evaluation forms. (Previous to that year, Thomas had written positive evaluations of Colston's performance each year she had been chair of the department.) Faculty-evaluation forms pertaining to Colston and signed by Thomas for the 2007-2008 academic year and subsequent years stated that Colston was non-tenured. Also, Colston refused to sign her faculty-evaluation forms from 2007 through 2010 on the basis that, she said, they incorrectly stated that she was not tenured.
In the fall of 2009, undertaking to act in her capacity as president of the University's chapter of the AEA, Colston organized and invited all faculty, staff, and administration to attend a presentation to be held on October 20, 2009, titled "Cut Waste, Redundancy-Not Jobs, Not Pay" ("the presentation"). Colston sent the invitation through the University's e-mail system. Kenneth Hairston of the University's office of general counsel sent Colston a letter on October 15, 2009, regarding "the email you sent through campus email notifying the university family of an all-campus meeting." Hairston stated that,
"[a]lthough [the University] AEA may call meetings on campus, only the president has the authority to call an 'all-campus' meeting. An 'all-campus' meeting implies that employees are authorized to take time away from their positions to attend the meeting. In this case, that is not true since the president did not call the 'all-campus' meeting."
*38 The letter was copied to Hugine. In her deposition testimony, Colston asserted that she had called such meetings in the past and had not received any complaints from the administration for those invitations.
The presentation was given by University Professor Haresha Khanna. Colston helped prepare the slides for the presentation. The presentation complained that, despite increased revenues, the University had cut the budget for instruction; it had required faculty members to increase their teaching loads; and it was "contemplating outsourcing custodial and ground services functions of the University." The presentation also complained that the University was "continuing to spend more on administration and non-value adding activities." It expressed displeasure with the University's administration for implementing furlough programs that resulted in cutting salaries of faculty and staff. In this regard, the presentation charged that "[t]he furlough program implemented by the administration is grossly unfair, inequitable and down right regressive. It is, clearly a pay cut for the faculty." The presentation summarized the grievances as follows: "Something is seriously wrong here; what have we done to be punished? Faculty and staff should not have to sacrifice for gross negligence and sheer incompetence of the management."
The presentation called for solutions such as: "Cut waste and redundancy, improve operational efficiency, by better management and accountability"; "Divest from non-value added activities"; and "build reserves." The presentation asserted that the University's "organization structure was built to deal with different challenges from a different era. Too often, the result is wasteful spending, bloated bureaucracy and programs producing less than the desirable results." The presentation claimed to offer proposals "to reduce/manage costs and grow revenues which are concrete and quantifiable," which included "proposing ways that [the University] should be organized to operate efficiently by cutting waste and redundancy" and to build reserves. Among other things, the presentation called for the University to "[r]estructure, realign and consolidate functions of the top administration."
Undertaking to act in her capacity as president of the University's chapter of the AEA, Colston submitted a request to make the presentation before the Board. When the Board declined to hear the presentation, Colston sent copies of the presentation to the editorial board of The Huntsville Times and other media outlets in communications in which she identified herself as president of the University's chapter of the AEA. On October 20, 2009, a Huntsville television station ran a news story about the presentation in which Colston was identified as the president of the University's chapter of the AEA.
On December 1, 2009, again undertaking to act in her capacity as president of the University's chapter of the AEA, Colston sent a copy of the presentation and a letter to then Governor Bob Riley. The letter provided:
"We respectfully request your immediate intervention on behalf of the citizens of this great state and employees of Alabama A & M University [AAMU] to rescind the recent employment-related decisions made by the administration of Dr. Andrew Hugine, Jr., the president of the university.
"We request that AAMU, a state instrumentality, observe and follow the rule of law, longstanding practices and traditions, the constitutionally guaranteed rights and privileges of fellow citizens, and above all respect the dignity of *39 all who are affected by the decisions made.
"The recent decisions made by Dr. Hugine directly affect our livelihood, the academic integrity of the institution and have enormous impact on the local and regional economies of north Alabama. Financial and economic stress we are all experiencing was not precipitated by the common faculty or staff members of the university. Declining state support is not unique to AAMU. It is clear, however, AAMU administration was ill-prepared in dealing with the situation and opted for furloughs and pay reduction, and cutting jobs, while other public universities implemented alternative methods of dealing with the situation.
"We appreciate and applaud your executive orders and subsequent actions promoting the openness, honesty, and accountability in state government. We respectfully ask that you instruct Dr. Hugine to open the financial records of the university for the last five years and moving forward so that we the taxpayers can analyze and assess the situation.
"We look forward to your immediate response and intervention on our behalf. Time is of the essence."
The Governor responded to Colston's letter in a letter dated December 11, 2009, in which he thanked Colston for "taking the time to contact my office regarding your concerns with recent decisions made by the administration of Alabama A & M University." The letter informed Colston that the Governor had forwarded her submission to President Hugine for his "review and consideration." The Governor also "encourage[d]" Colston "to follow up with Dr. Hugine and his administration to discuss your concerns."
On December 9, 2009, Colston issued a press release referencing the fact that the University recently had regained accreditation from the Southern Association of Colleges and Schools ("SACS") after SACS had placed the University on probation for 12 months. The press release stated, in pertinent part:
"The AAMU-AEA Chapter cautions the AAMU Board of Trustees to be more responsible in protecting the hard work, scholarship, research, teaching and extension done by the faculty and staff and which is accredited under the Southern Association of Schools and Colleges.
"The behavior of the BOT has been embarrassing and seriously damaged the good work of the people who really matter: students, faculty, and staff.
"We also caution the administration under the leadership of Dr. Andrew Hugine, Jr., to not punish the people who have built this great University. Recent communications give cause for concern that it is his intention to collapse and dismantle important programs that will ultimately jeopardize our University status and may land us on probation again but for different reasons. This action is a veiled attempt to remove faculty and staff to save money.
"We urge Dr. Hugine to rethink the use of the stimulus money to save faculty and staff positions which affect programs rather than using the money for dorms. The stimulus money was to be used to save jobs and reduce the impact of student tuition increases. Restoring academic buildings and not dorms are lower on the hierarchy. The use of the stimulus money for buildings is punitive to the faculty and staff and reflects a laziness and lack of vision on the part of the Administration to raise badly needed funds for deferred maintenance. We urge the President to begin work fundraising to address the dorm issues and *40 where appropriate seek redress through the State of Alabama.
"We also urge the President to begin meeting with the faculty and staff in the various schools to shore up morale and seek input directly from these constituencies in a spirit of unity."
The following day, December 10, 2009, The Huntsville Times reported that Colston, "A & M's AEA Chapter President ... handed out a Press Release ... urging the Administration to not punish people who have built this great University."
Martha Sherrod, a member of the Board, subsequently sent an e-mail to the other members of the Board, which was copied to Hugine, with the subject heading "Release from Regina Colston." In the e-mail, Sherrod stated: "Ms. Colston's release is replete with misinformation. I resent her statement that 'The behavior of the BOT has been embarrassing and seriously damages the good work of the people who really matter,' and recognize that her behavior has been allowed to go unchecked for a number of years."
On March 10, 2010, Professor Khanna was terminated from his position, which he had held for more than 30 years. On May 27, 2010, Colston, again undertaking to act as president of the University's chapter of the AEA, sent Wims an e-mail in which she "respectfully request[ed] that you please insure proper procedure is followed by Dr. Barbara Cady and the Faculty Senate regarding the grievance hearings and the forwarding of the rulings" for faculty members who had been terminated, including Professor Khanna. The e-mail stated that the AEA was particularly concerned that a ruling on Professor Khanna's grievance might be delayed given the "particular interest" that "[t]he University administration has taken ... in Dr. Khanna's hearing."
Colston testified at Professor Khanna's grievance hearing. In her testimony, she accused Hugine and others in the University's administration of conspiring to deny Professor Khanna due process, and she asserted that he was unfairly fired. Colston also testified that the administration systematically was not applying the grievance procedures fairly and in accordance with its own policies and procedures as demonstrated by the way Professor Khanna's hearing was conducted. This testimony was recorded and reported to the Board in October 2010.
Colston alleges that sometime during the 2009-2010 school year, the dean of the School of Arts and Sciences, Matthew Edwards ("Dean Edwards"), and the chair of the Department of English, Foreign Languages, and Telecommunications, Thomas, tried to get Colston to change the grades of students who, according to Colston, had not earned the grades Thomas and Dean Edwards were suggesting. Colston represented to some of her colleagues and to some members of the administration that the request for grade changes was unethical behavior.
On September 15, 2010, several exchanges occurred between Dean Edwards, the new chair of Colston's department, Gatisinzi Basaninyenzi, Ph.D., and Colston in which Colston noted what she termed "unethical" behavior of the administration. The behavior referenced by Colston concerned an Internet television project she had personally developed that had been taken over by Dean Edwards and the coordinator of the department without providing Colston with academic credit for the project.
Thomas retired from her position on July 1, 2010. On August 12, 2010, Thomas wrote a letter addressed to Wims that was placed in Colston's file. Basaninyenzi, as the new chair of the department, also received *41 a copy of the letter. In the letter, Thomas stated that the chairperson prepares the faculty evaluations and that Colston had failed to sign or return her evaluation forms for the past three years. Thomas stated that "[t]he major point of contention on the [2007-2008] evaluation was [Colston's] tenure status." The letter noted that Colston had refused to sign recent evaluations because they indicated that she was not tenured. Thomas concluded the letter with the assertion that Colston's
"failure to respond adequately to the evaluation process during the past three years reveals the evasive, defiant and dishonest patterns of her behavior and her refusal to follow required procedures. She has circumvented all of my efforts to discuss her performance while the quality of her work continues to decline. Her 2009-2010 evaluation clearly reveals her unsatisfactory performance. It is obvious that she has no intentions of improving. I recommended her dismissal."
In his deposition, Wims admitted that he received Thomas's letter, but he stated that it did not constitute a basis for his recommendation that Colston's employment be terminated. Likewise, Basaninyenzi testified that he did not act on Thomas's recommendation because he "had not supervised [Colston]" at that point in time.
It is undisputed that the University was facing budget problems when Hugine was hired as president in 2009. As part of its 2009-2010 budget, the University raised tuition and fees, reduced personnel, implemented faculty furloughs, and outsourced facilities management. The presentation organized and disseminated by Colston criticized those measures.
The University's budget shortfalls continued through the 2010-2011 fiscal year and the 2011-2012 fiscal year. According to Hugine's testimony, in order to address the problem, he tasked the vice presidents of the University, including Wims, with "the responsibility of compiling recommendations to address these issues." Wims recommended the dismissal of a large number of University employees. Accordingly, he met with the Dean's Council of the University concerning this recommendation.
Pursuant to Wims's instructions, Dean Edwards began reviewing the files of faculty members for the purpose of evaluating faculty for dismissal. In the course of developing a list of potential dismissals, Dean Edwards reviewed the tenure status of each candidate for dismissal. In the case of Colston, Dean Edwards stated that he took into account the May 11, 2010, note from Thomas stating that Colston was not tenured and the fact that he did not see anything in Colston's personnel filed indicating that she was tenured. Dean Edwards testified that he placed Colston on his list of recommendations for dismissal because he "wanted the strongest faculty I can, most capable faculty for both teaching and scholarly productivity," which meant keeping those "who are publishing, who are about their profession, and who are engaged in academic process for it." In total, Dean Edwards recommended seven faculty members in the School of Arts and Sciences for dismissal.
Dean Edwards submitted his recommendations to Wims. Wims then investigated Colston's tenure status before making his recommendation for dismissal. The investigation included a review of Colston's personnel file, as well as directives to Dean Edwards and Basaninyenzi to search for any helpful documents. Wims admitted that in the course of his investigation he saw in Colston's file the October 25, 2006, letter from Edmond to Colston that stated *42 that Colston was tenured, but he stated that he concluded that Edmond must have been mistaken based on the lack of evidence that Colston had obtained tenure through the normal procedures. According to Wims, following his investigation he concluded that there was no evidence indicating that Colston had ever been awarded tenure through the ordinary approval process.
Thereafter, Wims, Dean Edwards, and Basaninyenzi met to discuss the dismissal of employees within the Department of English, Foreign Languages, and Telecommunications. Basaninyenzi testified that Colston was not specifically discussed during the meeting. Basaninyenzi stated, however, that he was aware that Colston was one of the highest paid non-tenured faculty in his department. At the conclusion of the meeting, Wims, Dean Edwards, and Basaninyenzi executed memoranda dated June 22, 2011, recommending Colston and six other faculty members within the School of Arts and Sciences for dismissal.
After receiving the memorandum recommending Colston's dismissal, Hugine approved her dismissal. Hugine testified that the recommendation from Basaninyenzi, Dean Edwards, and Wims constituted all that he considered in approving Colston's dismissal. In correspondence dated June 24, 2011, Hugine informed Colston that "based on the recommendation of your Chair, [Basaninyenzi] and approval by Dean [Edwards] and [Wims,] Provost and Vice President of Academic Affairs, ... your employment ... will end effective July 31, 2011." The correspondence did not list a reason for the termination. Its subject heading read: "No Cause Termination of Your Employment at Alabama A & M University."[5]
James D. Montgomery, Sr., a member of the Board of Trustees at the time Colston filed the present action, testified in his deposition as to the reason he believed Colston's employment was terminated:
"I believed then, as I do now, that she was terminated because of her outspokenness, because she was challenging. And, in my opinion, the University, or President Hugine and his administrative staff ... seem to have it in for you if you cross them in any way.
"And I say that because that's not based on hearsay or based-it's based on my own personal experience with them. So, I believe that she was terminated and fired from her job because she spoke up, where she testified at [Professor] Khanna's hearing, if that would have been considered going against the administration. And I believe that's why they fired her. I don't think it was because she wasn't tenured. I don't think it was because she wasn't doing a good job. It was because she was stirring up trouble."
Montgomery also testified that he thought "there was animus toward [Colston] from [Wims] and Dr. Hugine."
Colston filed a grievance upon being fired. The Grievance Committee held a hearing concerning Colston's dismissal on September 8, 2011. In the hearing, the University reiterated that Colston's was a so-called "no-cause" termination. After the hearing, on September 26, 2011, the chair of the Grievance Committee, Patricia Young, sent Colston a letter stating that a majority of the committee members found that certain exhibits submitted by Colston *43 "suggest that you are Tenured." The Grievance Committee sent the administration a letter recommending that it consider some of the evidence indicating that Colston was tenured before finalizing the termination of her employment. The administration had the vice president for academic affairs consider the matter, and he notified Colston that her dismissal was final.
Colston filed this action on November 30, 2011, in the Madison Circuit Court against the University; the Board; the members of the Board and Hugine in their official capacities; and Hugine in his individual capacity. The University filed a motion to dismiss the complaint, and, in response, Colston filed her first amended complaint on February 22, 2012. The University renewed its motion to dismiss in a filing submitted March 7, 2012.
On May 1, 2012, the trial court entered an order on the pending motions to dismiss in which it, in pertinent part, dismissed all state-law claims that sought recovery of monetary damages against the University.
On November 2, 2012, Colston filed a second amended complaint that contained 11 counts and that added as defendants Wims in both his official capacity and his individual capacity and Thomas in her individual capacity. Relevant to the present petition are six counts of the second amended complaint: counts 2 and 4, which alleged violations of Colston's First Amendment rights, and counts 7 through 10, which alleged violations of state law.
Count 2 asserted that Colston "engaged in speech by opposing and criticizing the financial practices, the handling of administrative appointments, the unethical changing of grades and usurpation of academic pursuits, the business practices, and other important matters of public concern relating to [the University]." It alleged that Hugine and Wims improperly terminated Colston's employment because she exercised her First Amendment right to free speech by discussing the above-listed matters. Colston requested damages against Hugine and Wims in their individual capacities for violating Colston's constitutional right to free speech by terminating her employment.
Count 4 alleged that Hugine and Wims terminated Colston's employment because of her association with the AEA, an association protected by the First Amendment. Colston requested damages against Hugine and Wims in their individual capacities for violating Colston's constitutional right to free association by terminating her employment.
Count 7 alleged that Hugine and Wims wrongfully terminated Colston's employment because they dismissed her without providing her a pretermination hearing.[6] Colston alleged that she was entitled to a pretermination hearing because, she says, she was a tenured employee. The complaint stated that "Dr. Hugine (in his individual capacity) and Dr. Wims (in his individual capacity) acted wilfully, maliciously, fraudulently, in bad faith, beyond their authority or under a mistaken interpretation of law in terminating Regina Colston's employment without a pre-termination hearing."
Count 8 alleged that Hugine and Wims committed fraud or misrepresentation by allowing Colston to believe that she was tenured and "[w]ithout disclosing to her their belief that she was obligated to take further actions under the policies" in order to obtain tenure. Colston alleged that she "reasonably relied on these material omissions *44 and/or misrepresentations regarding her tenured status and ... reasonably expected continued employment as a tenured assistant professor." Colston further alleged that "[t]hese misrepresentations and/or omissions" were to her detriment when she was dismissed without a pretermination hearing. Colston asserted that Hugine and Wims should be held individually responsible for "terminating Regina Colston's employment without cause and without a pre-termination hearing on the basis that she was not tenured."
In counts 9 and 10, Colston alleged that Thomas and Wims tortiously interfered with Colston's contractual relationship with the University. With regard to Thomas, Colston alleged that she committed a series of acts intended to undermine Colston's tenured status. With regard to Wims, Colston alleged that he was aware that Colston had tenure but that he "conspired with Thomas and instructed her to place a memorandum in the file [stating] that Regina Colston was not tenured in order to terminate her not for cause and avoid her being available for an interview by SACS, for which he was responsible."
On November 16, 2012, the University filed a "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" concerning the second amended complaint. The parties engaged in extensive discovery that included deposing 19 witnesses and producing nearly 23,000 pages of documentation. On July 26, 2013, all the defendants filed a "Supplemental Motion for Summary Judgment." In that motion and the memorandum of law that accompanied it, the defendants argued that Hugine and Wims were entitled to qualified immunity in their individual capacities for Colston's First Amendment retaliation claims (counts 2 and 4) and that Hugine, Wims, and Thomas were entitled to State-agent immunity in their individual capacities as to Colston's state-law claims (counts 7 through 10).
On December 11, 2013, the trial court entered an order addressing various motions for a summary judgment. Specifically, the trial court entered a summary judgment in favor of the defendant as to all claims by Colston seeking compensatory and/or punitive damages against any defendant in the defendant's official capacity. The trial court denied summary judgment as to all other claims asserted by Colston.
Subsequently, Hugine, Wims, and Thomas filed the present petition for a writ of mandamus with this Court in which they asked this Court to vacate the trial court's December 11, 2013, order to the extent that it denied Hugine and Wims qualified immunity from Colston's First Amendment retaliation claims against them in their individual capacities and to the extent that it denied Hugine, Wims, and Thomas State-agent immunity from Colston's state-law claims against them in their individual capacities and to enter a summary judgment in their favor as to Colston's claims against them.
II. Standard of Review
"This Court has stated:
" ' "While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
" ' "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the *45 record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991) ; will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala. 1992) ; and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
" ' "An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992)." '
" Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000) ). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: ' "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." ' Ex parte Nall, 879 So.2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001) )."
Ex parte City of Montgomery, 99 So.3d 282, 291-92 (Ala. 2012).
"We review the validity of a qualified immunity defense de novo. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)." Volkman v. Ryker, 736 F.3d 1084, 1089 (7th Cir. 2013). We are also mindful of the fact that, "[a]s a general rule, 'summary judgment is particularly inappropriate in first amendment cases.' " Hatcher v. Board of Pub. Educ. & Orphanage for Bibb Cty., 809 F.2d 1546, 1558 (11th Cir. 1987) (quoting Ferrara v. Mills, 781 F.2d 1508, 1515 (11th Cir. 1986) ).
III. Analysis
A. Colston's First Amendment Claims and Qualified Immunity
As we noted in Part I of this opinion, Colston asserts claims under 42 U.S.C. § 1983 alleging that Hugine and Wims violated her First Amendment rights to free speech and free association when they terminated her employment with the University. Hugine and Wims assert that they are protected from Colston's claims by qualified immunity because, they say, they were acting within their discretionary authority when they terminated Colston's employment and they did so for budgetary reasons, not because of Colston's First Amendment activities.
"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ).
"In Saucier [v. Katz,] 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 [ (2001) ], this Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (see *46 Fed. Rules Civ. Proc. 12(b)(6), ©)) or shown (see Rules 50, 56 ) make out a violation of a constitutional right. 533 U.S. at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. Ibid. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. Anderson [v. Creighton, 483 U.S. 635,] 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 [ (1987) ]."
Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
Before we evaluate the two prongs of the test for qualified immunity, however, we must examine the threshold issue of discretionary function. "To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004). In this regard, "[o]ur inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265.[7]
Colston contends that Hugine and Wims were not engaged in a discretionary function because they allegedly violated requirements of the University handbook in terminating Colston's employment. In making this argument, however, Colston misunderstands the nature of the initial inquiry concerning the applicability of qualified immunity.[8]
"Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. ...
"....
"Consider the first prong of the test-whether the official is engaged in a legitimate job-related function. In Sims v. Metropolitan Dade County, 972 F.2d 1230 (11th Cir. 1992), 'we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline.' Harbert [Int'l, Inc. v. James ], 157 F.3d [1271] at 1282 [ (11th Cir. 1998) ]. ... Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description.
*47 "....
"After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function-that is, pursuing his job-related goals-in an authorized manner. ... Each government employee is given only a certain 'arsenal' of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism."
370 F.3d at 1265, 1266-67 (some emphasis added).
Employment decisions are clearly within the job description of the president of the University, and the provost is specifically designated to help the president in making such decisions. See § 16-49-23, Ala. Code 1975. Likewise, dismissal is among the tools available to the president in making employment decisions. See id. Therefore, when they terminated Colston's employment, Hugine and Wims were engaged in a "discretionary function" as that concept is understood for purposes of the doctrine of qualified immunity.
"[O]nce a defendant establishes that he was engaged in a discretionary function at the time of the acts in question, the burden shifts to the plaintiff to show that the defendant is not entitled to summary judgment on qualified immunity grounds. To do so, the plaintiff must demonstrate that a reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question."
Holloman, 370 F.3d at 1267.
Colston has alleged that Hugine and Wims should be personally liable for money damages because, she contends, they violated her First Amendment rights to free speech and free association. Evaluating whether a government official violated the free-speech rights of a government employee-Colston was employed by a state-sponsored university-involves its own special test grounded in the decision of the United States Supreme Court in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In Boyce v. Andrew, 510 F.3d 1333, 1342 n.12 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit explained:
"Following Pickering, our analysis of retaliation against an employee by a government employer for alleged constitutionally protected speech has been comprised of four parts:
" 'To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, [ (4) ] the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech.' "
(Quoting Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005).)
"Whether an employee's speech addresses a matter of public concern *48 must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "[T]he Connick test requires us to look at the point of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise issues of public concern? Or was the point to further some purely private interest?" Hesse v. Board of Educ. of Twp. High Sch. Dist. No. 211, Cook Cty., Ill., 848 F.2d 748, 752 (7th Cir. 1988). "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego, Cal. v. Roe, 543 U.S. 77, 83-84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). "[Because] '[a]n employee's speech will rarely be entirely private or entirely public,' the 'main thrust' of the employee's speech must be determined." Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000) (quoting Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) ).
The petitioners contend that "the 'main thrust' of [Colston's] 'speech' concerned quintessential internal college affairs and items of personal, rather than public, concern." (Quoting Myles v. Richmond Cty. Bd. of Educ., 267 Fed.Appx. 898, 900 (11th Cir. 2008) (not selected for publication in the Federal Reporter).) Colston disagrees. Indeed, the parties disagree as to the application of each of the Pickering factors.
Courts use the same general test for evaluating whether defendants in their individual capacities are entitled to qualified immunity from free-association claims as they do for free-speech claims, i.e., whether the defendants' conduct violated a constitutional right and whether that right was "clearly established" at the time of the defendants' action. One difference between a free-speech analysis and a free-association analysis is that, "unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment." D'Angelo v. School Bd. of Polk Cty., Fla., 497 F.3d 1203, 1212 (11th Cir. 2007). Courts do apply the remainder of the Pickering test, however, in evaluating whether a defendant violated a public-employee plaintiff's right to free association. See, e.g., Ross v. Clayton Cty., Ga., 173 F.3d 1305, 1310 (11th Cir. 1999) (stating that " Pickering requires the district court to balance the interest of the public employee in exercising his right of free speech or association against the 'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " (quoting Pickering, 391 U.S. at 568, 88 S.Ct. 1731 )). Again, the parties disagree as to the proper application of essentially all the elements of the law applicable to Colston's associational claims.
In this case we need not determine whether Colston's speech addressed matters of public concern, how to balance Colston's free-speech interests against the public employer's interest in effective and efficient fulfillment of its responsibilities, whether Colston's speech played a substantial motivating factor in her dismissal, or whether other aspects of the Pickering test are met as to Colston's free-speech claims. Nor must we resolve similar disputes over application of the Pickering test to Colston's associational claims. Those issues may be pretermitted because, even if Colston presented substantial evidence in her favor on all of these matters, the record reflects a separate, objectively lawful basis for terminating Colston's employment.
In Foy v. Holston, 94 F.3d 1528 (11th Cir. 1996), the United States Court of Appeals for the Eleventh Circuit explained the applicable law in so-called "mixed-motive cases":
*49 "That state officials can act lawfully even when motivated by a dislike or hostility to certain protected behavior by a citizen is well established. See Mt. Healthy v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).... For example, state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent. Mt. Healthy, 429 U.S. at 286-87, 97 S.Ct. at 576.
"....
"One trigger to the doctrine's application depends upon whether the record establishes that the defendant, in fact, did possess a substantial lawful motive for acting as he did act. At least when an adequate lawful motive is present, that [an unlawful] motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct-despite his having adequate lawful reasons to support the act-was the result of his unlawful motive, the defendant is entitled to immunity. Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."
94 F.3d at 1534-35 (some emphasis added).
It is not plain as a legal matter, under the specific facts and circumstances of this case, that the defendants' conduct-despite adequate lawful reasons therefor-was the result of their unlawful motive. It is undisputed that there were budgetary constraints in existence at the University at the time of Colston's dismissal. In June 2011, the University administration reported to the Board of Trustees that the University would experience a $10.6 million reduction in state funding for the 2011-2012 fiscal year. The administration simultaneously announced that a significant number of University personnel would be dismissed in an effort to address the funding shortfall. The petitioners note that even Professor Khanna in his presentation conceded that the University was overstaffed and that this overstaffing included faculty. Perhaps most significantly, it is undisputed that, as a result of the budget shortfall, the University subsequently dismissed 33 employees, including 7 faculty members in the School of Arts and Sciences, and that Colston was among those let go. Consequently, there was an adequate lawful basis for terminating Colston's employment.[9]
It also is undisputed that Dean Edwards initially compiled the list of seven faculty members from the School of Arts and Sciences who would be recommended for dismissal, and Colston was on the list. Dean Edwards testified without contradiction that he did not consult with anyone else in developing the criteria for placement of a faculty member on the list or in producing his initial list. He stated that he formulated the list as he did because he "wanted the strongest faculty ..., most capable faculty for both teaching and scholarly productivity," which meant keeping those *50 "who are publishing, who are about their profession, and who are engaged in academic process for it."[10] Dean Edwards testified that he was unaware of Colston's position with the AEA or with her speaking activities performed in that role. Of particular note, it is undisputed that neither Hugine nor Wims suggested to Dean Edwards that he should put Colston on his list.
After he compiled his list, Dean Edwards met with Wims and Basaninyenzi. According to Dean Edwards, Basaninyenzi requested that one faculty member on the list (not Colston) be substituted for another, but the three men did not discuss Colston. Basaninyenzi also confirmed that they did not discuss Colston. At the conclusion of the meeting, Wims, Dean Edwards, and Basaninyenzi executed memoranda recommending the termination of the employment of Colston and six other faculty members within the School of Arts and Sciences. Hugine testified that he approved the dismissals based solely on the recommendations from those officials. Both Hugine and Wims testified that budget shortfalls were the driving force behind all the dismissals.
Colston argues that the budgetary shortfall was a pretext for firing her for impermissible reasons. She points to evidence indicating that the petitioners did not raise the budget concerns as a defense until 14 months into the action and the fact that the University sought a replacement to teach Colston's courses. This, however, does not constitute substantial evidence that, but for the allegedly protected speech and associations, Hugine and Wims would have ignored the recommendations on the list, a list that was not influenced in any way by suggestions from Hugine or Wims. In addition, there is evidence indicating that the budget concerns were not raised earlier in the action because the relevant persons involved in the decision-making process were not deposed by Colston until that time. Although it is true that the University advertised for another communications faculty position, this simply represented the University's effort to find professors to teach some of the courses Colston taught; the University did not fill Colston's full-time position.[11]
As was the case in Foy, "the record makes it clear that the Defendants' acts"-which in this case followed approximately a year and a half after the activity at issue-"were actually motivated by lawful considerations without which they would not have acted." Foy, 94 F.3d at 1535. In discussing its own facts as well as those in Foy, Johnson v. City of Fort Lauderdale, Fla., 126 F.3d 1372 (11th Cir. 1997), and Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1294 (11th Cir. 2000), the court in Rioux v. City of Atlanta, 520 F.3d 1269 (11th Cir. 2008), provides a helpful discussion:
"We now turn to Appellees' defense of qualified immunity, interposed in the individual capacity claims for money damages. '[Q]ualified immunity protects *51 government officials performing discretionary functions from the burdens of civil trials and from liability,' McMillian v. Johnson, 88 F.3d 1554, 1562 (11th Cir. 1996) (citing Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)), '[i]n all but exceptional cases.' Id. It is only 'when an official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known" ' that 'the official is not protected by qualified immunity.' Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ).
"....
"Rioux's claims, if believed, would establish a violation of the Equal Protection Clause, which ensures the right to be free from intentional discrimination based on race. Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003) ; see also Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1064 (11th Cir. 1992) (holding that intentional discrimination in hiring and firing practices violated Equal Protection Clause). If the trier of fact believed Rioux's showing of pretext, and disbelieved Appellees' proffered legitimate reason, then a violation of the Equal Protection Clause would be shown. The 'other' evidence from which a jury might infer discriminatory animus on the part of Rubin and COO Young, which we have summarized above, constitutes that showing by Rioux, at the summary judgment stage, of the violation of a constitutional right.
"....
"We therefore turn to an examination of 'whether the defendant's conduct was nonetheless "objectively reasonable" in light of that [Equal Protection] right.' Johnson [v. City of Fort Lauderdale, Fla. ], 126 F.3d [1372] at 1378 [ (11th Cir. 1997) ] (citing Anderson [v. Creighton ], 483 U.S. [635] at 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 [ (1987) ] ). Rioux must demonstrate at this step in the qualified immunity analysis that a reasonable fire chief and a reasonable chief operating officer of a city would know that demoting a high-ranking, subordinate, discretionary officer in the factual circumstances presented here violated clearly established law. See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1294 (11th Cir. 2000) (citing Harlow, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 ). And it is this that he cannot show.
"Clearly established law provides that state officials 'can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully....' Foy, 94 F.3d at 1534 (citing Vil. of Arlington Hts. v. Metro. Housing Dev., 429 U.S. 252, 269-71 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ); see also Mt. Healthy v. Doyle, 429 U.S. 274, 286-87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Thus, 'state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent.' Id. (citing Mt. Healthy, 429 U.S. at 286-87, 97 S.Ct. 568 )....
"Foy explained:
" 'At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct-despite his having adequate lawful reasons to support the act-was the result of his unlawful motive, the defendant is entitled to immunity. Where the facts assumed *52 for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.'
" 94 F.3d at 1534-35.
"Tracking the reasoning used in Foy to reverse the denial of summary judgment where qualified immunity was interposed as a defense, here no jury could find that it would have been unlawful for a fire chief and the city's chief operating officer to do as Appellees did if they had lacked discriminatory intent. Id. at 1535. No jury could find that a reasonable fire chief and chief operating officer would never have demoted Rioux but for a discriminatory intent. Id.The record here, as in Foy , undisputably establishes that Appellees were motivated at least in part by lawful justifications, supported by the independent investigations conducted by OPS [Office of Professional Standards] and the Law Department, investigations which these two decisionmakers were not a part of and which there is no evidence they manipulated. Id. at 1535 n.9. Cf. McMillian, 88 F.3d 1554 (affirming trial court denial of summary judgment where genuine issues of fact existed as to reasons officials placed plaintiff on death row, in part, due to issue of whether officers lied concerning their reasons).
"....
"The objective reasonableness inquiry in Stanley proceeded in the following manner. Chadwick, the chief of police, had cause to resent Stanley, a police officer who had years before named Chadwick as a suspect in an investigation. Years after Stanley's remarks, and following several disciplinary incidents, Chadwick terminated Stanley, and Stanley brought a section 1983 action for violation of his first amendment rights. The reversal of the denial of a motion for summary judgment on qualified immunity rested on two undisputed facts. First, the record undisputably established that objectively valid reasons existed for the step Chadwick took, because the incidents underlying the discipline that led to the termination did in fact take place. Thus, 'no jury could find that it would have been unlawful to terminate Stanley as Chadwick did absent retaliatory motive.' Id. at 1296.
"Second, summary judgment was appropriate because the record undisputably established that Chadwick was motivated, at least in part, by the lawful considerations of the disciplinary incidents. A four-year time gap existed between Stanley's initial protected speech naming Chadwick as a suspect, and in those four years, Stanley had engaged in actions that resulted in discipline. 'Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable police chief-faced with the same undisputed evidence of Stanley's misconduct and undisputably acting at least in part because of Stanley's misconduct-should not have terminated Stanley in the same manner.' Id. at 1297 (citing Johnson, 126 F.3d at 1379 ).
"Similarly, Johnson reversed the denial of a summary judgment motion raising qualified immunity on the ground that the demotion and discharge of the plaintiff-firefighter was based on indisputable and adequate lawful motives, specifically, the firefighter's failure to obey a direct order and repeated lies at his disciplinary hearing. 126 F.3d at 1379. In Johnson, '[e]ven assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did *53 not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner.' Id. at 1379. Cf. Bogle [v. McClure ], 332 F.3d [1347] at 1356 [ (11th Cir. 2003) ] (affirming denial of renewed motion for judgment as a matter of law following jury verdict where evidence suggested defendants' evidence of reorganization plan was a sham designed to cover-up race-based transfers and jury squarely found appellants intentionally discriminated on account of race, rejecting proffered nondiscriminatory reasons).
"Here, the record shows Appellees were in fact motivated, at least in part, by objectively valid reasons in demoting Rioux. Notwithstanding the evidence of pretext, which is sufficient to sustain Rioux's burden of showing that his demotion was the result of discrimination, there is no evidence that Rubin or COO Young influenced two independent investigations concerning the May 2, 2004 incident. There is no evidence that the May 2, 2004 incident did not in fact take place, or that the incident did not involve some violation of one or more work rules by the second-highest ranking member of the AFD. No evidence was presented that Appellees' decisions to demote Rioux were not motivated, at least in part, by the lawful consideration of the OPS and Law Department's concluded investigations and findings. We cannot say that, even assuming Appellees were acting with improper race-based animus or a desire to address race-balancing in the workplace, reasonable officials faced with the same evidence of Rioux's violations of work rules would have known that demoting Rioux violated clearly established federal law.
"Because pre-existing law did not provide fair warning to Appellees that demoting Rioux under these circumstances would violate clearly established federal law, Appellees are entitled to qualified immunity."
Rioux, 520 F.3d at 1282-85 (some emphasis added). As was the case in Foy, Rioux, Stanley, and Johnson, there is no genuine issue as to whether the defendants in the present case "were motivated at least in part by lawful justifications, supported by independent [recommendations] ... which these ... decisionmakers were not a part of and which there is no evidence they manipulated." Rioux, 520 F.3d at 1284.
"When public officials do their jobs, it is a good thing. Qualified immunity is a real-world doctrine designed to allow local officials to act (without always erring on the side of caution) when action is required to discharge the duties of public office. See Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) ('[O]fficials should not always err on the side of caution.'). For many public servants, a failure to act can have severe consequences for the citizenry. ...
"As we decide this case, we cannot forget the purpose of qualified immunity. The qualified immunity defense functions to prevent public officials from being intimidated-by the threat of lawsuits which jeopardize the official and his family's welfare personally-from doing their jobs. Qualified immunity can be a muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate-before they act or do not act-if their conduct will give rise to damage liability for them."
Foy, 94 F.3d at 1534.
Ultimately, Foy instructs that "whenever a public officer is sued for money *54 damages in his individual capacity for violating federal law, the basic qualified immunity question looms unchanged: Could a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?" Id. The clear answer to that question in this case is yes. Budgetary constraints are a common and entirely legal reason for dismissing employees. The evidence indicates that Hugine and Wims were motivated, at least in part, by the University's financial situation in deciding to terminate Colston's employment. There is also no evidence indicating that the unconstitutional motive advanced by Colston for her dismissal was a factor in her name being placed on the original list of faculty members Dean Edwards offered as candidates for dismissals. In short, under the test enunciated in Foy, Hugine and Wims established as a matter of law that they would have made the same decision concerning Colston's employment with the University even in the absence of her speech and associational activities. Therefore, Hugine and Wims are entitled to qualified immunity from Colston's federal constitutional claims, and the trial court erred in concluding otherwise.
B. Colston's State-law Claims and State-agent Immunity
Colston also asserts claims against Hugine, Wims, and Thomas under state law related to the termination of her employment. Specifically, Colston alleged claims of wrongful termination and fraud against Wims and Hugine; she alleged claims of tortious interference with a contractual relationship against Wims and Thomas. The petitioners contend that they are entitled to State-agent immunity from those claims and that the trial court exceeded its discretion in failing to dismiss those claims on that basis.
"This Court, in [ Ex parte] Cranman [, 792 So.2d 392 (Ala. 2000) ], stated the test for State-agent immunity as follows:
" 'A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
" '(1) formulating plans, policies, or designs; or
" '(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
" '(a) making administrative adjudications;
" '(b) allocating resources;
" '©) negotiating contracts;
" '(d) hiring, firing, transferring, assigning, or supervising personnel; or
" '(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
" '(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
" '(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
" 'Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
" '(1) when the Constitution or laws of the United States, or the Constitution *55 of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
" '(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'
" Cranman, 792 So.2d at 405."
Ex parte City of Montgomery, 99 So.3d 282, 292-93 (Ala. 2012).
" 'This Court has established a "burden-shifting" process when a party raises the defense of State-agent immunity.' Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006). A State agent asserting State-agent immunity 'bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity.' 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable."
Ex parte Kennedy, 992 So.2d 1276, 1282 (Ala. 2008).
Before we analyze the elements of State-agent immunity for each of Colston's claims, we note at the outset that Colston has argued that the University is not an instrumentality of the State and, therefore, that its officials are not eligible for State-agent immunity. Colston reaches this conclusion first by observing that one of the factors this Court has articulated for determining whether an entity is an instrumentality of the State is the " 'degree of control the State maintains over the entity.' " Ex parte Madison Cty. Bd. of Educ., 1 So.3d 980, 987 (Ala. 2008) (quoting Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003) ). Colston then contends that after the enactment of the amended version of § 16-49-23, Ala. Code 1975, the University "has insulated itself from State control and the State has virtually zero degree of control over [the University]."
We note with some curiosity that Colston essentially argues that the means by which the University allegedly gained autonomy from State control came about through an enactment of the legislature. The inherent contradictions of the argument aside, we wholly reject it. This Court has repeatedly stated that " 'Alabama A & M University is an instrumentality of the State of Alabama and, thus, is absolutely immune from suit under § 14.' " Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala. 2004) (quoting Matthews v. Alabama Agric. & Mech. Univ., 787 So.2d 691, 696 (Ala. 2000) ). Section 16-49-23 merely shifted to the University's president some powers previously assigned to its Board of Trustees. It does not purport to state or imply that the University itself is no longer under the State's control. The University is an instrumentality of the State, and, therefore, the petitioners are eligible for State-agent immunity.
There is no dispute that the claims Colston asserts against the petitioners arise from functions that would entitle them to State-agent immunity. Wims and Hugine exercised their judgment in the administration of the University on an issue of firing personnel, and Thomas exercised her judgment in supervising Colston. Colston contends, however, that the exception for actions that are willful, malicious, fraudulent, in bad faith, beyond authority, or taken under a mistaken interpretation of the law applies to her state-law claims. It is Colston's burden to present substantial evidence demonstrating that this exception applies to her claims.
*56 First, Colston asserted in her second amended complaint a claim alleging wrongful termination against Wims and Hugine. Colston noted that our courts have stated that " '[t]he dismissal of a public employee who is entitled to a pretermination hearing, without such a hearing, is a wrongful act constituting a tort under Alabama law.' " Hardric v. City of Stevenson, 843 So.2d 206, 210 (Ala. Civ. App. 2002) (quoting City of Gadsden v. Harbin, 398 So.2d 707, 708 (Ala. Civ. App. 1981) ). Colston alleged that she was tenured but that Wims recommended that Colston's employment be terminated and Hugine terminated her employment without providing Colston with a pretermination hearing, a procedure to which she says she was entitled based on her tenured status. Specifically, the complaint stated: "Dr. Hugine (in his individual capacity) and Dr. Wims (in his individual capacity) acted willfully, maliciously, fraudulently, in bad faith, beyond their authority or under a mistaken interpretation of law in terminating Regina Colston's employment without a pre-termination hearing."
The submissions before us do not contain evidence indicating that Wims and Hugine acted in bad faith or beyond their authority by terminating Colston's employment without a pretermination hearing. Although Colston presented evidence indicating that Hugine was told shortly after he was hired that Colston was tenured, it is undisputed that Wims later undertook an investigation to determine Colston's tenure status. Wims admitted that in the course of that investigation he encountered the October 25, 2006, letter from Beverly Edmond, Ph.D., the then provost and vice president for academic affairs, to Colston that stated that Colston was "a tenured member of the faculty." He concluded, however, based on the totality of the evidence in Colston's file, that she was not tenured, and he recommended to Hugine, after reaching that conclusion, that Colston's employment be terminated. The parties agree, because of the conflict in the evidence on the question, that Colston's tenure status is a jury question. And Colston cites no evidence indicating that either Wims or Hugine knew or believed that Colston was tenured at the time they made the decision to terminate her employment. Indeed, in her fraud allegations against Wims and Hugine, Colston asserted:
"Dr. Hugine ..., Dr. Wims ... and the Trustees ... were aware or should have been aware of Regina Colston's understanding and belief that she was tenured. Without disclosing to her their belief that she was obligated to take further actions under the policies [to become tenured ], defendants continued to utilize the services of Regina Colston."
(Emphasis added.) Without evidence indicating that Wims or Hugine knew or believed that Colston was tenured at the time they terminated her employment without a pretermination hearing, it cannot be said that they acted willfully or in bad faith by doing so.
Colston argues that, "[a]t a minimum, th[e] evidence shows Hugine and Wims acted beyond their authority" when they terminated Colston's employment without complying with policy-manual procedures applicable to tenured employees. It is true that our cases hold that an employee may be deemed to act "beyond authority and therefore not be immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.' " Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003) (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000) ). See also, e.g., Ex parte Watson, 37 So.3d 752 (Ala. 2009). But the question that must be asked in *57 this case is whether it fell to Hugine and Wims in the first place-i.e, was it part of their job-to make a judgment call as to whether Colston was tenured so as to trigger Colston's entitlement to the "guidelines" or "checklist" of procedures to which she claims to have been entitled.
The complaint alleges that Colston was a tenured employee and therefore that Hugine and Wims acted beyond their authority by, for example, terminating Colston's employment without a pretermination hearing. Colston might well be correct if this was a typical tenure case in which the plaintiff's tenured status was a given and the only issue to be resolved was whether proper termination procedures had been employed. If that were the circumstance here, then it might well be concluded that, because the individual defendants proceeded without granting Colston a pretermination hearing, they violated the "guidelines" or "checklist" applicable to the termination of a tenured employee.[12]
But that is the unique thing about this case. We cannot and do not start with the premise, as do most tenure cases, that the plaintiff was in fact tenured. Instead, it is the administrative decision as to that issue that is the true point of contention in this case. That is, before the defendants were required to provide Colston with the very hearing to which she says the University's "guidelines" and "checklist" entitled her, they first had to make the administrative decision whether she was in fact tenured. If she was not, then she was not entitled to such a hearing; the claimed "guidelines" or "checklist" would not be applicable.
Hugine and Wims fulfilled their responsibility to make the administrative decision whether Colston was or was not tenured; they concluded that she was not. Colston does not allege that in reaching that judgment, Hugine and Wims failed to follow some "checklist" of procedures applicable to that decision. They therefore cannot be deemed to have acted beyond their authority on the ground that they failed to follow a set of detailed guidelines or a detailed checklist.
Of course, once Hugine and Wims decided that Colston was not tenured, that decision dictated a different procedural path for subsequent personnel decisions regarding Colston. If they made a good-faith decision as to this historical fact, but just happened to get it wrong based on their review of conflicting records in the plaintiff's file, then the plaintiff could not sue them personally. The plaintiff may well be entitled to seek relief from them in their official capacities in that circumstance (and thereby get reinstated and/or obtain the benefit of a required hearing or other procedures applicable to tenured employees), but if all these individuals did was fulfill their administrative responsibility to make a judgment call as to whether the plaintiff was tenured and they made a mistake in that judgment call, then the plaintiff is not entitled to pursue those individual defendants' personal bank accounts under the "beyond-authority" exception to State-agent immunity. They were doing their jobs as state-school officials, and it is the protection of officials engaged in such discretionary activities that is the purpose of State-agent immunity. Compare Ex parte Ingram, 229 So.3d 220, ---- (Ala. 2017) ; see generally Ex parte Cranman, 792 So.2d 392 (Ala. 2000).
Colston also asserted fraud claims against Wims and Hugine in their individual capacities. The gist of those claims is that Wims and Hugine knew that Colston *58 believed she was tenured, and they allowed her to work for the University under that assumption without informing her that they did not believe that she was tenured. Colston asserted that Wims knew Colston believed she was tenured because Thomas had written Wims a letter in which she had stated that "[t]he major point of contention on [Colston's 2007-2008 faculty] evaluation was [Colston's] tenure status." The letter also had noted that Colston had refused to sign recent evaluations because they indicated that she was not tenured. Colston alleged that Hugine knew that Colston believed she was tenured because Riggins had told Hugine that Colston was tenured shortly after Hugine was hired as president of the University in 2009. Colston alleged that "[t]hese misrepresentations and/or omissions" were to her detriment when her employment was terminated without a pretermination hearing.
Colston's complaint in essence alleges fraudulent suppression against Wims and Hugine.
"In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements:
" ' "(1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result." ' "
Johnson v. Sorensen, 914 So.2d 830, 837 (Ala. 2005) (quoting Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1161 (Ala. 2003), quoting in turn State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 323-24 (Ala. 1999) ).
The first problem with Colston's fraud claim is that Colston simply assumes that Wims and Hugine had a duty to disclose their belief that she was not tenured. "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." Mason v. Chrysler Corp., 653 So.2d 951, 954 (Ala. 1995). Colston cites no authority to establish the existence of a duty on the part of Wims and Hugine to disclose,[13] nor does she explain why Wims or Hugine would have a duty to disclose their beliefs about Colston's tenure status to Colston other than stating that they were both given information at one time or another that indicated that Colston was tenured. As we already have noted, however, Wims and Hugine did not conclude that Colston was not tenured until after Wims investigated the issue during the process of deciding whether to terminate her employment. Before that point, neither Wims *59 nor Hugine had any reason to disclose anything to Colston about her tenure status because, according to Colston's facts, the information they had been given indicated that she was tenured. Moreover, Wims and Hugine were not directly supervising Colston, so they did not have a relationship to her that would require communication on such a subject. In short, Colston does not establish that Wims or Hugine had a duty to disclose the fact that they believed she was not tenured.
The second problem with Colston's fraud claim is that she did not establish that she acted or refrained from acting in some way based on the alleged suppression of the fact that she was not tenured. Starting in 2007, Colston was in fact told by Thomas several times that she was not tenured. Despite receiving this communication, Colston did nothing to assert her position, other than refusing to sign faculty-evaluation forms that indicated that she was not tenured. There is no evidence indicating that, at any time before her employment was terminated, Colston asked the dean of the School of Arts and Sciences or Wims or Hugine to confirm her tenured status. Likewise, Colston does not state, and there is no evidence to suggest, that, before her employment was terminated, Colston would have submitted herself to the regular procedure for obtaining tenure rather than simply continuing to insist, as she did, that she was tenured.
Finally, even if Colston relied on the previous representations of other University administration officials that she was tenured such that she did not attempt to do anything to gain tenured status, the alleged omissions by Wims and Hugine were not the proximate cause of the harm Colston claims. Under her fraud claim in her complaint, Colston stated: "Dr. Hugine (in his individual capacity) and Dr. Wims (in his individual capacity) acted willfully, fraudulently, in bad faith, beyond their authority or under a mistaken interpretation fo law in terminating Regina Colston's employment without cause and without a pre-termination hearing on the basis that she was not tenured." Colston was fired without a pretermination hearing because Wims and Hugine believed Colston was not tenured, not because they suppressed that belief. There is no evidence to suggest that Colston's employment would not have been terminated had she been told that she was not tenured. In reality, Colston's claim of injury under her fraud claim mirrors her claim of injury for her wrongful-termination claim. In other words, she states as a fraud claim what is, in fact, a breach-of-contract claim. A breach of contract, alone, does not constitute fraud. See Heisz v. Galt Indus., Inc., 93 So.3d 918, 925 (Ala. 2012) (noting that a " 'failure to perform alone is not sufficient evidence to show a present intent not to perform. If it were, then every breach of contract would be "tantamount to fraud." ' " (quoting Gadsden Paper & Supply Co. v. Washburn, 554 So.2d 983, 987 (Ala. 1989), quoting in turn Purcell Co. v. Spriggs Enters., Inc., 431 So.2d 515, 519 (Ala. 1983) )).
For all of these reasons, we conclude that Colston failed to present substantial evidence that Wims or Hugine acted fraudulently; therefore, Wims and Hugine are entitled to State-agent immunity as to Colston's fraud claims against them.
The last state-law claims contained in Colston's second amended complaint that are before us in this mandamus petition are claims alleging tortious interference with a contractual relationship against Wims and Thomas. With regard to Thomas, Colston alleged that Thomas knew that Colston was tenured and that, in fact, she told Colston for 10 years that she *60 was tenured. Colston asserted that after she accused Thomas of unethical behavior related to changing the grade of one of Colston's students, Thomas started noting on Colston's faculty-evaluation forms that she was not tenured, "with the intent of ensuring [Colston] would lose her job." Colston alleged that after Colston recommended to Dean Edwards that Thomas should be replaced as chair of Department of English, Foreign Languages, and Telecommunications, Thomas's "malice against Regina Colston grew and she further attempted to create an opportunity to deprive Regina Colston of her property right of tenure." Those further actions included writing the memorandum of May 11, 2010, which went in Colston's personnel file and which stated that "Colston is non-tenured," and writing the August 12, 2010, letter a month after she retired that was placed in Colston's personnel file in which Thomas recommended that Colston's employment be terminated because of "the evasive, defiant and dishonest patterns of her behavior and her refusal to follow required procedures." With regard to Wims, Colston alleged that Wims knew that Colston was tenured but that he "maliciously conspired with Thomas and instructed her to place a memorandum in [Colston's personnel] file that Regina Colston was not tenured in order to terminate her not for cause."
The essential elements of the tort of intentional interference with contractual or business relations are: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." White Sands Grp., L.L.C. v. PRS II, LLC, 32 So.3d 5, 14 (Ala. 2009). Our courts also have stated:
"An employee who desires to maintain a suit against a coworker for intentional interference with the employee's employment contract must also ' "show that the [coworker] acted outside [his or her] scope of employment and did so maliciously." ' Hanson v. New Technology, Inc., 594 So.2d 96, 103 (Ala. 1992) (quoting Hickman v. Winston County Hosp. Bd., 508 So.2d 237, 241 (Ala. 1987) (Adams, J., concurring specially)). Further, in order to show malice the plaintiff must ' "make a strong showing of a pattern of interference." ' Perlman v. Shurett, 567 So.2d 1296, 1299 (Ala. 1990) (quoting Hickman, 508 So.2d at 241 (Adams, J., concurring specially))."
Michelin Tire Corp. v. Goff, 864 So.2d 1068, 1077 (Ala. Civ. App. 2002).
Colston's tortious-interference claim against Wims is problematic for at least three reasons. First, Colston failed to present any evidence supporting her accusation that Wims told Thomas to write the May 11, 2010, memorandum that stated that Colston was non-tenured. Thomas testified that Dean Edwards instructed her to write the memorandum. Wims stated that he had never seen the memorandum before the initiation of Colston's lawsuit. The memorandum itself was addressed to "Dr. Matthew Edwards, Dean School of Arts and Sciences." In fact, Thomas testified that she never talked to Wims about Colston, and Wims testified that he never consulted Thomas about Colston. In short, there is simply no evidence of a conspiracy between Wims and Thomas.
The second problem with Colston's claim against Wims is that, aside from her allegation of a conspiracy with Thomas, Colston made no showing of a pattern of interference by Wims. Finally, even if Wims had told Thomas to write the May 11, 2010, memorandum, it was within the line and scope of his position to do so as Thomas's superior and as the vice president for academic affairs at the University.
*61 In sum, Colston failed to produce evidence indicating that Wims interfered with Colston's contractual relationship with the University and failed to demonstrate that Wims acted willfully, maliciously, in bad faith, or beyond his authority in this regard. Therefore, Wims is entitled to State-agent immunity as to Colston's claim of tortious interference against him in his individual capacity.
Colston's tortious-interference claim against Thomas in her individual capacity fares no better than Colston's similar claim against Wims. Colston presented evidence indicating that Thomas knew Colston was tenured and told her as much over a long period, but that, in the 2007-2008 school year, Thomas began noting otherwise on Colston's faculty-evaluation forms without providing any explanation for the change. Around the same time, Thomas started to give Colston poor marks on her faculty evaluations, which followed several years of more favorable evaluations. Thomas wrote the May 11, 2010, memorandum, which stated that Colston was non-tenured and which Dean Edwards testified he took into account when he evaluated Colston's tenure status in the course of considering which faculty members to place on a list for employment termination. Thomas also wrote the August 12, 2010, letter recommending that Colston's employment be terminated based on insubordination and poor performance, which was addressed to Wims and which was copied to Basaninyenzi.
We see here no substantial evidence of bad faith or malice on Thomas's part. Colston makes much of the conflict between herself and Thomas that occurred in the 2009-2010 school year when, according to Colston, Colston refused to alter certain students' grades at Thomas's urging. In an evaluation of Colston, Thomas stated that the grade-change situation was one that required the involvement of herself, the dean of the School of Arts and Sciences, the associate provost, the provost, and an ad hoc committee, when it should have been handled by Colston if she had maintained proper records.
Regardless of this conflict of evidence, it was well before this, namely in the 2007-2008 academic year, that Thomas started rating Colston poorly in her faculty-evaluation forms. That was also the same year Colston's faculty-evaluation forms started being marked as "Non-Tenured." (In response, Colston refused to sign her faculty-evaluation forms from 2007 through 2010 on the ground that they incorrectly stated that she was not tenured.)
In an evaluation of Colston, Thomas stated that during the 2009-2010 academic year Colston set up office hours in the School of Business library, away from the rest of the professors in her department, which caused logistical problems for faculty and for students seeking Colston's help. Thomas also stated that in the spring semester of the same year students complained that Colston often did not show up for her "Discussion for TV" class. Thomas also stated that several of Colston's courses were not being conducted in accordance with the syllabuses she had submitted to Thomas at the beginning of the academic year. Thomas further stated that for three years Colston was asked by colleagues to provide data from her Writing Broadcasting class but that she failed to present anything.
In short, several legitimate reasons existed for Thomas's negative evaluations of Colston and her recommendation that Colston's employment should be terminated.
IV. Conclusion
We grant the petition for a writ of mandamus. We conclude that the trial court erred in not holding that Wims and Hugine *62 were entitled to qualified immunity from Colston's retaliation claims based on alleged violations of her free-speech and free-association rights. We likewise conclude that Hugine, Wims, and Thomas were entitled to State-agent immunity with respect to Colston's state-law claims against them individually alleging wrongful termination, fraud, and tortious interference with a contractual relationship.
PETITION GRANTED; WRIT ISSUED.
Stuart, Bolin, Main, Wise, and Bryan, JJ., concur.
Parker, J., concurs in part and concurs in the result.
Shaw, J., concurs in the result.
I concur in the result as to Part III.B. of the opinion; I concur in the remaining aspects of the opinion.

The terms "associate professor" and "assistant professor" appear to be used interchangeably in the record.

Jones died before the underlying action was filed.

In his affidavit, Riggins testified:
"5. In the year 2009, Dr. Hugine and I had a specific discussion about Ms. Colston shortly after he was hired. I told him that Ms. Colston was the President of the University chapter of the AEA and a vocal advocate for the faculty and the staff at the University. I told him that Ms. Colston was tenured, and if he wanted to terminate her he would have to build a strong case in the files around her job performance.
"6. I did not instruct Dr. Hugine to terminate Ms. Colston. I told him that if he wanted to fire her, he would have to do so based on well-documented performance problems because she was tenured and because she was President of the University chapter of the AEA.
"7. Dr. Hugine and I specifically discussed the presence of the AEA chapter at the University and the nuisance that the AEA would likely be to him. We also discussed Ms. Colston's active leadership role in the AEA."

An update of the faculty handbook in 1993 modified the procedure to provide that the "final decision" on promotions and tenure was made by the president of the University.

In 2011, the Alabama Legislature amended § 16-49-23, Ala. Code 1975, placing in the office of the president of the University certain powers previously held by the Board. Of particular note is the fact that the amended statute empowered the president, rather than the board of trustees, to terminate the employment of University faculty.

Colston also asserted this claim against the members of the Board in their official capacities, but that aspect of count 7 is not before us in the present mandamus petition.

"In many areas other than qualified immunity, a 'discretionary function' is defined as an activity requiring the exercise of independent judgment, and is the opposite of a 'ministerial task.' See, e.g., Williams v. Wood, 612 F.2d 982, 985 (5th Cir. 1980). In the qualified immunity context, however, we appear to have abandoned this 'discretionary function/ministerial task' dichotomy. In McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995), we interpreted 'the term "discretionary authority" to include actions that do not necessarily involve an element of choice,' and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function."
Holloman, 370 F.3d at 1265.

In misunderstanding a portion of the qualified-immunity analysis, Colston is far from alone. See, e.g., Ex parte Madison Cty. Bd. of Educ., 1 So.3d 980, 994 (Ala. 2008) (Murdock, J., concurring in the result) (suggesting that there may be " 'no area of the law which is more confusing than qualified immunity ....' " (quoting Flowers v. Bennett, 123 F.Supp.2d 595, 601 (N.D. Ala. 2000) )).

Any claim that termination of Colston's employment was improper because she was tenured is not part of Colston's First Amendment claims. Notwithstanding Colston's focus on the "facts" regarding the issue of her tenure, this particular case concerns Colston's First Amendment rights, not her rights as an allegedly tenured faculty member.

Dean Edwards also stated that Colston was the highest paid non-tenured professor in the School of Arts and Sciences.

Colston also cites James Montgomery's testimony as to his belief that Colston was fired for "stirring up trouble." Yet, Montgomery did not talk to Hugine or Wims about Colston's dismissal. His statements merely reflected his opinion as to the reason for the termination of Colston's employment. Importantly, Montgomery's testimony does not dispute that there was a cost-cutting effort at the University, nor does it cast any doubt on the legitimacy of the creation of the list used to achieve the necessary cost-cutting. Montgomery's conclusory testimony did not meet the particulars of the objectively lawful motive otherwise shown for the termination of Colston's employment.

We do not mean to imply that, in such a circumstance, the plaintiff necessarily would be entitled to an award of monetary damages against the individual defendants personally.

Colston cites two cases in a footnote in her brief that address the duty issue, Rigby v. Auburn University, 448 So.2d 345 (Ala. 1984), and Johnson v. Waters, 970 F.Supp. 991 (M.D. Ala. 1997), but neither is on point. The portion of Rigby Colston cites simply notes that a university employee could bring a fraud claim against a supervisor for allegedly altering the terms of a plaintiff's employment. See Rigby, 448 So.2d at 347. That is not the nature of Colston's fraud claim against Wims and Hugine. The portion of Johnson Colston cites discusses the fact that a county commission's refusal to intervene when the plaintiff's supervisor discharged the plaintiff in violation of her constitutional rights constituted a claim against the county commission. Again, the situation described in Johnson is not what Colston alleges occurred in her case. Neither case addresses a duty to disclose a material fact.